## UNITED STATES DISTRICT COURT
## DISTRICT OF IOWA

-------------------------------------------------------------------X

TOM ROSSLEY,

          **Plaintiff,**

      -against-

DRAKE UNIVERSITY, and DRAKE UNIVERSITY
BOARD OF TRUSTEES

          **Defendants.**
-------------------------------------------------------------------X

Civ. No.

**COMPLAINT**

*JURY TRIAL
DEMANDED*

Plaintiff Tom Rossley (hereinafter referred to as "Plaintiff" or "Mr. Rossley") by his attorneys with Babich Goldman, P.C. and Nesenoff & Miltenberg, LLP as and for his Complaint, respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1.    Drake University (hereinafter "Defendant Drake" or "Drake University") purports to be "committed to fair and ethical practices and conduct in all business employment and academic relationships." The sad truth is, however, that Defendant Drake, while perhaps a beacon to the residents in Des Moines, Iowa, selectively chooses the students and staff it believes are deserving of fair and ethical treatment, to the direct detriment of many of its constituents. Indeed, despite housing the Harkin Institute, named after Iowa Senator Tom Harkin, the primary author and promoter of the Americans with Disabilities Act of 1990, Drake University openly discriminated against its disabled students and, together with its Board of Trustees, instituted a concerted attack on all those who dared speak out for the rights of Drake University's students, including Mr. Rossley.

1

2.    Plaintiff experienced first-hand Drake University's underhanded treatment of disabled students when Defendants maliciously withheld necessary accommodations from his disabled son.  Adding insult to injury, Defendants purposefully ignored Plaintiff's disabled son's pleas for help after he was sexually assaulted by a fellow, female student at Defendant Drake. Plaintiff made numerous efforts to address such heinous violations of his disabled son's rights but to no avail. Indeed, instead of remedying the numerous unlawful acts of Drake University, Defendants instead instituted an immediate attack on Plaintiff and effectively silenced and covered up Plaintiff's complaints, to the direct detriment of Plaintiff's family and career, as well as Drake University's students.

## THE PARTIES

3.    Plaintiff is a male citizen of the United States and resident of the state of Illinois.

4.    Upon information and belief, Drake University is a private, co-educational university that offers a number of undergraduate and graduate programs, as well as professional programs, located in Des Moines, Iowa.

5.    Upon information and belief, Defendant Drake University Board of Trustees ("Defendant Board") is the governing body of Drake University. Defendant Board is composed of approximately 33 voting members, and approximately 29 of the voting members are Drake University alumni. Upon information and belief, "[f]ull authority on matters pertaining to Drake University rests with the University's Board of Trustees."[1] Moreover, upon information and belief, the Defendant Board and its members are subject to Defendant Drake's Policies and Procedures as any employee of Drake University would be.

---

[1] www.drake.edu/media/departmentsoffices/catalogfiles/archive/pdfugrad0607/15-BOT-UniversityGov.pdf

## JURISDICTION AND VENUE

6.      This Court has diversity, federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because: (i) Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; (ii) the claims herein arise under federal law; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

7.      This Court has personal jurisdiction over Drake University and the Defendant Board on the grounds that Defendants conduct business within the State of Iowa.

8.      Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim(s) occurred in this judicial district.

## CONDITIONS PRECEDENT

9.      Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against all Defendants, which was cross-filed with the Iowa Civil Rights Commission. The EEOC has not yet issued Plaintiff a Right to Sue Notice. When Plaintiff receives a Right to Sue Notice, Plaintiff intends to amend his complaint to assert violations of the Americans with Disabilities Act of 1990 ("ADA") and the Iowa Civil Rights Act of 1965.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

*The Drake University Board of Trustees*

10.    Defendant Drake, a private university of higher education located in Des Moines, Iowa, is operated and maintained by the Defendant Board.

11.    The Defendant Board maintains and operates according to a series of amended bylaws (the "Defendant Board's Amended Bylaws"). As the governing body of Drake University, as per the Defendant Board's Amended Bylaws, the trustees of the Defendant Board are endowed with the power and obligation to, among other things:

    a.  Determine and periodically review the purposes and the mission of the University and its colleges and schools;

    b.  Elect the President, who shall be the Chief Executive Officer of the University, and remove him or her for just cause;

    c.  Authorize the establishment or discontinuance of colleges, schools, or degree programs of the University upon recommendation of the appropriate faculty bodies and the President of the University;

    d.  Establish policies regarding appointment, compensation, promotion, tenure, and dismissal of faculty members;

    e.  Review and establish the terms and conditions of employment for all administrators, staff, and other employees of the University;

    f.  Approve and authorize the awarding of earned degrees to qualified candidates upon recommendation of the appropriate faculty;

    g.  Act on all candidates recommended for honorary degrees by the Faculty Senate and the President of the University;

    h.  Establish the budgets of the University;

    i.  Establish policies for the management of the endowment and investment funds of the University;

    j.  Establish policies and provide leadership for all fundraising programs of the University;

    k.  Authorize the purchase and sale of all land, buildings, or major equipment for use of the University;

    l.  Authorize the construction of and major alteration to buildings and other University properties;

    m.  Authorize the incurring of debts by the University and securing thereof by mortgage and pledge of real and personal property, tangible and intangible;

     n.  Authorize fees, and establish tuition, room, and board charges;
     o.  Designate officers or agents and other voluntary organizations that support the University or any of its units; and
     p.  Control and authorize the use of the name "Drake University" or "Drake" by any outside or institutionally related group.

12.    Although members of the Defendant Board do not receive financial remuneration, Defendants do provide Board members certain benefits, including insurance coverage, as part of their compensation for serving as a member of the Defendant Board.

13.    Further, the Defendant Board and each of its members are subject to Drake University's internal Policies and Procedures to the same extent as Drake University's faculty and staff members are.

14.    Plaintiff, at all times relevant, was an active and participating member of the Defendant Board and established himself as a well-respected and integral member of everyday life at Drake University. By way of example, Plaintiff, who served on the Defendant Board as a faithful trustee for twenty-three (23) years, has, among other things:

     a.  Helped to vet and appoint potential candidates for President of Drake University;
     b.  Served on a number of the Defendant Board's subcommittees including:
         i.  Student Life Committee – on this subcommittee, Plaintiff interacted with Defendant Drake's students on a regular basis and helped to establish and update Defendants' Code of Student Conduct and Sexual Misconduct Policies;
        ii.  Business Finance and Investments Committee – Plaintiff served as the Chairman of this subcommittee for approximately two (2) years and worked very closely with Defendant Drake's Vice President of Finance. Further, Defendant Drake enlisted Plaintiff's services as a trustee and member of this subcommittee to advise Defendant Drake in the acquisition of a 32-million-dollar bond intended to build a new facility on the Drake University campus. Further, as a member of this subcommittee, Plaintiff oversaw Defendant Drake's endowment, directed investment policy initiatives, and selected investment managers;
        iii.  Audit Committee – on this subcommittee, Plaintiff oversaw both the internal and external auditors of Drake University;

5

iv.   Academic Affairs Committee – on this subcommittee, Plaintiff oversaw faculty issues, academic programming, and tenure issues for Defendant Drake;

v.   Enrollment Committee – on this subcommittee, Plaintiff served as the Chairman and, among other things, reviewed Defendants' Pharmacy enrollment growth decisions; and

vi.   Institutional Advancement Committee – on this subcommittee, Plaintiff oversaw alumni and fundraising initiatives for Defendant Drake which included managing a 100-million-dollar capital campaign;

c.   Was an active supporter of Defendant Drake's Development Office, and regularly identified potential donors, met with them on behalf of Defendant Drake, and encouraged them to financially support Drake University;

d.   Vigorously supported the admissions process at Defendant Drake by calling and meeting with prospective students on behalf of Defendant Drake; and

e.   Represented the Defendant Board at numerous events at Drake University.

15.    Indeed, Plaintiff was so entwined with Defendant Drake, its students, and affairs that he was known to some as "Mr. Drake."

16.    As a member of the Defendant Board, Plaintiff had fiduciary duties to the Defendant Board and to Defendant Drake, including but not limited to: the duty of loyalty, the duty of care, and the duty of obedience. Plaintiff always discharged his duties to the Defendant Board, Defendant Drake, and each student at Drake University in a professional manner, put the interests of the Defendants first, and always acted in the best interests of Defendants.

***Plaintiff's Disabled Son's Medical and Educational History***

17.    Plaintiff has a disabled son who, like his father, hoped to enroll in Drake University. Since adolescence, Plaintiff's disabled son has suffered from a series of mental and learning disabilities. Specifically, Plaintiff's disabled son was diagnosed at the age of five (5) with ADHD, language based learning and word retrieval disabilities, and anxiety. Plaintiff's disabled son's disabilities were documented in a neuropsychological evaluation by Rush

Neurobehavioral Center; testing by the Johnson O'Connor Research Foundation; and in the Individual Education Program (IEP) by Plaintiff's disabled son's high school.

18.     Plaintiff's disabled son's disabilities severely impacted and substantially limited his ability to perform everyday major life activities and had a significant effect on his ability to learn and communicate.

19.     As a result of his disabilities, Plaintiff's disabled son attended The Gow School for Dyslexia and Learning Disabilities in South Wales, New York, a college preparatory boarding and day school for students with dyslexia and similar language-based learning disabilities during the spring semester of 8th grade and his entire freshman year of high school. As a high school sophomore, Plaintiff's disabled son transferred to, and ultimately graduated from, Walter Payton College Preparatory High School ("Walter Payton Prep"), a highly-ranked public high school in Chicago, Illinois. Walter Payton Prep accommodated Plaintiff's disabled son's language and communication based learning disability, anxiety, and ADHD related learning disabilities for all 3 years of his tenure there.

20.     Moreover, Plaintiff's disabled son received accommodations during the college testing process when he sat for and took the American College Testing ("ACT") exam. Specifically, Plaintiff's disabled son was afforded time and a half to complete the ACT exam because he required additional time to process the questions and formulate the proper responses.

*Plaintiff's Disabled Son Enrolls in Drake University*

21.     Following in the footsteps of his father, Plaintiff's disabled son applied, and was accepted, to Defendant Drake for admission to the Class of 2016. Upon information and belief, Defendant Drake was aware of the accommodations previously provided to Plaintiff's disabled

son.   Further, upon information and belief, when Plaintiff's disabled son applied to Drake University, he noted his disabilities on his application. Moreover, Plaintiff had numerous conversations with Defendant Drake's Vice President of Admissions regarding his disabled son's application and medical condition.

22.     Upon information and belief, Drake University's staff, including Plaintiff's disabled son's professors, knew of his disabilities and his need for educational accommodations, which were well documented with Drake University. Indeed, Plaintiff's disabled son requested daily accommodations in the classroom at Drake University starting in the Spring 2014 semester, which Defendant Drake granted. Accordingly, Defendants at all times, knew or should have known, that Plaintiff's disabled son was disabled and required accommodations in the school environment to help him communicate, understand, and grow academically.

### Defendants' Compliance with Title IX of the Education Amendments of 1972 ("Title IX")

23.     On April 4, 20111,  the Department of Education ("DOE") Office for Civil Rights ("OCR") issued the Dear Colleague Letter which handed down instructions on how to comply with Title IX when investigating and resolving complaints of sexual misconduct on college campuses.

24.      One of the starkest instructions given to universities was to adopt the lowest burden of proof—the preponderance of the evidence or "more likely than not" standard—in cases involving sexual misconduct, including sexual assault. At the time, several colleges had been using a "clear and convincing evidence" standard and some even applied the criminal standard, "beyond a reasonable doubt," when investigating complaints of sexual misconduct under Title IX.

25.     Though enforced as binding law under a threat of rescission of federal funding, this proposed new lower standard was never subjected to notice-and-comment rulemaking, and therefore its validity is questionable at best.

26.     Despite this fact, OCR began investigating many colleges and universities because of their handling of sexual assault and harassment complaints. Drake University was caught up in one such investigation in October 2014, and, upon information and belief, such investigation remains ongoing.

27.     OCR's investigations put millions of dollars in federal student aid at risk. This is because DOE/OCR can impose civil penalties and/or suspend institutions from participating in federal student financial aid programs if DOE/OCR finds a university did not do enough to discipline respondents alleged to have engaged in sexual misconduct with complainants.

28.     For Drake, the withdrawal of federal funding would be catastrophic in part because, upon information and belief, for the year ending June 30, 2014, Drake had received $1,058,675 in federal funding and $8,988,122 in government grants and contracts, in addition to the federal student loan money it receives. *See* Drake University Audit Report, FY 2014, available at http://www.drake.edu/media/departmentsoffices/businessandfinance/busfin/ documents/Final%20FY14%20Drake%20Audit%20Report%20(SHORT%20FORM).pdf (accessed 9/12/16).

29.     Upon information and belief, OCR pressured Defendant Drake to apply the preponderance of the evidence standard.  Accordingly, the OCR investigations put immediate and tremendous pressure upon Defendant Drake to implement a lower burden of proof.  In turn,

this had an immediate, unilateral, and negative effect on those accused of sexual misconduct, which in the majority of instances were male individuals.

30.     Upon information and belief, as a result of continued pressure from governmental agencies such as OCR/DOE and/or internal forces at Defendant Drake, Drake University instituted a practice and policy of applying its Title IX policies in an unlawful and gender biased manner against male students.   Additionally, upon information and belief, Defendant Drake adopted and continues to implement gender-biased policies and procedures for addressing complaints of sexual assault in order to avoid negative publicity that Drake University did not adequately handle sexual assault investigations.

### *Drake University's Policies and Procedures with Respect to Title IX*

31.     Upon his acceptance, Defendant Drake provided Plaintiff's disabled son with copies of its school policies, including Drake University's Sexual and Interpersonal Misconduct Policy ("Sexual Misconduct Policy" or the "Policy") and the Drake University Student Code of Conduct ("Code of Conduct") (collectively, the "Policies").

32.     On its very first page, the Code of Conduct states: "The principles of equal access and equal opportunity require that all interactions within the University be free from invidious discrimination. Drake University therefore prohibits discrimination based upon race, color, national origin, creed, religion, age, disability, sex, gender identity, sexual orientation, genetic information or veteran status."

33.     With respect to cases involving allegations of sexual discrimination, sexual harassment, and sexual assault, Defendant Drake's Sexual Misconduct Policy provides as follows:

The purpose of this document is to set forth Drake University's policies and procedures related to Sexual and Interpersonal Misconduct. In addition, it is intended to ensure that the University's policies and procedures related to Sexual and Interpersonal Misconduct are interpreted and applied consistently with Title VII, IX, the Violence Against Women Act (VAWA), the Clery Act, and other applicable law. It is also intended to notify victims/survivors of their rights and resources that are available to them when Sexual or Interpersonal Misconduct occurs. Drake University prohibits discrimination on the basis of sex in its educational programs and in employment. This includes, but is not limited to, discrimination in the form of sex-based harassment (including sexual harassment), sexual assault and sexual exploitation (collectively referred to herein as "Sexual Misconduct"). Drake also prohibits dating violence, domestic violence, and stalking (collectively referred to herein as "Interpersonal Misconduct"). Finally, retaliation against anyone seeking guidance, filing a complaint or participating in an investigation into Sexual or Interpersonal Misconduct is strictly prohibited.

34.    Drake University's Dean of Student's Office is responsible for resolving student conduct issues.  The Code of Conduct provides the process by which students who have been accused of violating one or more of the enumerated sexual misconduct policies are investigated, heard and disciplined.

35.    All reports of incidents involving Sexual or Interpersonal Misconduct are referred to the Title IX Coordinator, Dean of Students or Director of Human Resources.

36.    Drake University allows "[a]ny student, student organization, faculty member or staff member" to initiate a complaint against a student or student organization suspected of non-academic misconduct. The Code of Conduct directs students to contact the Dean of Students office or Title IX Coordinator in the case of alleged sexual misconduct, and states that "[a]lternatively, the Dean of Students office may initiate a complaint on his or her own initiative,

in which case the Dean/designee will be considered the complainant. In any case, the Dean of Students will conduct an investigation into the complaint."

37.     The Title IX Coordinator oversees the Dean of Student/Designee's investigation of any complaint of sexual misconduct against a student and will ensure complaints are appropriately processed under applicable University Policies and Procedures, as stated in the Code of Conduct.

38.     In cases where an investigation by the Dean of Students/Designee results in a recommendation of a suspension or expulsion, the matter moves to a Disciplinary Hearing with a hearing officer.   The Dean of Students/Designee designates the hearing officer.   "The term 'hearing officer' means an impartial faculty member, administrator or where circumstances warrant, member of the public who has not had prior involvement in the case or the circumstances giving rise thereto."

39.     The Code of Conduct allows for the accused to have a personal representative present for the Hearing, and allows for that representative to be an attorney. The accused, the complainant and the Dean/designee may have a personal representative (including, but not limited to, an attorney) in attendance. The role of the personal representative is to provide counsel and advice, but a personal representative who is an attorney may also make an opening statement, a closing argument, and may also present written questions to be read by the hearing officer to a witness, but generally is not allowed to speak on behalf of or for their client.

40.     Furthermore, "[a]n accused student found by a hearing officer to have committed non-academic misconduct has the right to appeal." The complainant and Dean of the Students/Designee may also appeal the hearing officer's decision.

41. In a direct conflict of interest, the accused and the complainant submit notices of intent to appeal and written responses to appeal the decision to the Dean of Students/Designee, who simultaneously can appeal the hearing officer's decision.

42. The Dean of Students/Designee receives the appeal responses from the accused and/or complainant. The Dean of Students/Designee has three business days until s/he must provide all responses, including his or her own, to the other appealing parties and the Chair of the Judicial Commission.

43. The appeals are heard and decided by a three-member appeals panel.

44. The Chair of the Judicial Commission selects the appeal panel from the Judicial Commission, which consists of 21 members inclusive of 11 faculty and 10 students. The appeals panel consists of, "no more than one student and/or two faculty members on any given appeals panel."

45. The Code of Conduct states "a simple majority of the appeals panel is required to make its decision. The decision on appeal is final, subject only to the concurrence of the President or Provost." A student who has been expelled can be readmitted only by recommendation of the President.

46. Drake applies a "preponderance of the evidence" standard to violations of the Code of Conduct. "A violation of this Code is established upon proof of a charge by a preponderance of the evidence; a preponderance of the evidence exists when it is more likely than not, or the greater weight of the evidence suggests, a violation occurred."

47. The Code of Conduct further explains that:

> If, based on the investigation, the Dean of Students/designee does not form a reasonable belief that the charge or charges can be

13

proven by a preponderance of the evidence, after considering reasonable defenses, the Dean of Students/designee shall inform the accused student or student organization the complaint is being closed (subject to reopening should additional information become available) and in cases where the alleged act of non-academic misconduct is a crime of violence, a non-forcible sex offense, sexual misconduct, dating violence, domestic violence, or stalking, the complainant shall also be provided written notice of this determination. If, based on the investigation, the Dean of Students/designee forms a reasonable belief that the charge or charges can be proven by a preponderance of the evidence, after considering reasonable defenses, the applicable procedures set forth below shall be followed.

48.     Pursuant to the structure of Title IX, Drake University was required to treat any respondent and any complainant by equal application of the rules and procedures,s, and administer investigations and processes in a fair and equitable manner to both parties.

***Plaintiff's Disabled Son Becomes the Target of a Biased Title IX Investigation and Defendants Show an Obvious Bias Against Him in Favor of His Female Accuser***

49.     In or around the fall of 2015, Plaintiff's disabled son was accused by a fellow Drake University student of sexual assault. Following this accusation, Defendant Drake instigated an internal investigation pursuant to Title IX (the "Title IX Investigation"). Despite Defendants' requirement to administer a fair and equitable investigation to both Plaintiff's disabled son and his female accuser, such did not happen.

50.     The investigation was conducted by Mary Howell Sirna ("Investigator Sirna"), a Title IX Investigator employed by Drake University.  Investigator Sirna simultaneously was employed by Iowa State University as the Title IX Coordinator/ Interim Director of the Office of Equal Opportunity and also as Administrative Advisor for the Iowa State University Police.  She was a member of the Story County Sexual Assault Response Team.

14

51.     Normally, Drake University staff conducted sexual assault investigations. However, in the matter of Plaintiff's disabled son, Defendant Drake selected former prosecutor Investigator Sirna specifically because of Plaintiff's status as a Trustee. Upon information and belief, Investigator Sirna had never previously investigated a sexual assault complaint under Drake University's Code of Conduct. Investigator Sirna, formally a thirteen (13) year prosecutor of crimes of sexual violence, inherently lacked impartiality when determining the responsibility of the accused, Plaintiff's disabled son.

52.     Defendants' Assistant Director of Campus Public Safety, Tricia McKinney ("AD McKinney"), also participated in the Title IX Investigation.

53.     Investigator Sirna and AD McKinney were solely responsible for interviewing witnesses, writing the investigation report and determining if the accused was responsible for a violation of Drake University's sexual misconduct policy.

54.     Additionally, Investigator Sirna and AD McKinney had the discretion to decide the relevance of all proffered evidence and determine whether certain types of evidence would be included or excluded in the determination of responsibility. This bias in the process made it possible for the investigators to influence and even predetermine the outcome.

55.     Throughout the Title IX Investigation, Investigator Sirna and AD McKinney showed a clear bias against Plaintiff's disabled son and, among other things, (i) ignored key evidence; (ii) refused to speak with critical witnesses; (iii) failed to record the interviews they did conduct; and (iv) limited the amount of time spent with each witness to an unreasonable thirty (30) or sixty (60) minutes.

***Defendants Ignore Plaintiff's Disabled Son's Complaint of Sexual Assault***

56.     Alarmingly, Defendant Drake purposefully and maliciously ignored Plaintiff's disabled son's own report of sexual assault.  Specifically, during the Title IX Investigation, Plaintiff's disabled son reported that he had been assaulted by the complainant during the night of the alleged incident.  Plaintiff's disabled son reported that it was she who had initiated the sexual contact when she suggested that she and Plaintiff's disabled son leave his fraternity house and go to Plaintiff's disabled son's car to be alone, and he further reported that he was "not in a state to be with her" and "was not able to give consent that night."

57.     Appallingly, Defendant Drake only questioned Plaintiff's disabled son about his complaint to accuse him of retaliating against his complainant, and took no action to objectively or seriously investigate the merits of Plaintiff's disabled son's complaint.

58.     Plaintiff contacted Drake University's then Acting Dean of Students, Jerry Parker ("Dean Parker"), to inform him of the sexual assault of his disabled son during the night of the alleged incident.   In his phone conversation with Dean Parker, Plaintiff requested an investigation of the nonconsensual sexual assault of his disabled son. Dean Parker stated the claim was retaliatory and he refused to investigate the report.

59.     The Defendants' offices of the Dean of Students and Title IX both demonstrated deliberate indifference when they refused to investigate and dismissed the sexual assault claim by Plaintiff's disabled son, a male complainant, as well as by Plaintiff, a then-trustee of Drake University who, like all trustees, had a duty to report such a claim to Defendants.

60.     In essence, Defendants granted the female student immunity for her sexual assault on Plaintiff's disabled son, labelled his claims as "retaliation," and purposefully disregarded his

complaint.  Notably, neither Drake University's policies nor Title IX guidance allow a claim of sexual assault to be ignored, even if the university deems it to be retaliation.

61.     Indeed, the only 'immunity' recognized by Drake University's Code of Student Conduct and Sexual Assault Policies is for the use of alcohol and drugs, and the Code explicitly **excludes** several behaviors, including sexual assault. Furthermore, additional federal law, namely the Clery Act, recognizes that claims of sexual assault may be deemed "unfounded," but only after a complete and thorough investigation is conducted.  Such an investigation did not occur here.

### *Defendant Refuses to Afford Plaintiff's Disabled Son the Necessary Accommodations*

62.     At the beginning of his very first investigation interview, Plaintiff's disabled son disclosed to Investigator Sirna and AD McKinney that he had a learning and communication disability, which included Anxiety and ADHD.  Plaintiff's disabled son's disclosure should have immediately alerted Investigator Sirna and AD McKinney to the fact that Plaintiff's disabled son needed accommodations during the Title IX Investigation as he had throughout the regular school year. Such accommodations were especially vital as Plaintiff's disabled son's disabilities, which were known and documented by Defendant Drake, required accommodations to allow him extra time to process questions and formulate responses.

63.     Despite this fact, Investigator Sirna and AD McKinney never inquired into Plaintiff's disabled son's ability to participate in his interview or the Title IX Investigation, and never afforded or even offered Plaintiff's disabled son any of the necessary and legally mandated accommodations.

64.     As a result, Plaintiff's disabled son was forced to participate in the Title IX Investigation without any of the required accommodations which would have permitted him to fully defend himself against the heinous allegations lodged against him.

***Plaintiff Objects to Defendants' Biased and Unlawful Investigation***

65.     Throughout the Title IX Investigation, Plaintiff remained in contact with Defendant Drake's personnel and requested that his son be afforded the necessary accommodations to account for his disabilities.

66.     By way of example, in or around December 2015, Plaintiff spoke on the phone with Dean Parker regarding the Title IX Investigation.  At such time, Plaintiff again informed Dean Parker that his son had a learning disability, needed to have accommodations throughout the Title IX Investigation, and had been denied such accommodations.

67.     Specifically, Plaintiff told Dean Parker that throughout the Title IX Investigation, his disabled son had alerted Defendants to his disability and his need for accommodations in order to defend himself and accurately communicate his position and defense, and that such requests were summarily ignored.

68.     Plaintiff told Dean Parker that his disabled son was entitled to such accommodations and that the fact that he was not afforded same should be considered when determining his disabled son's alleged misconduct.

69.     In response, Dean Parker seemed disinterested in Plaintiff's complaints and advocacy for his disabled son.  Indeed, after mentioning his son's disability once more to Dean Parker, Dean Parker exuded a blatant and unlawful disdain for Plaintiff's disabled son and went

so far as to threaten Plaintiff more than once during this phone call to "Wait for the report; it's very damning."

70.     Plaintiff's requests, and those of his disabled son, for disability accommodations were summarily denied and, at numerous points, outright ignored.  Plaintiff's son was forced to participate in the Title IX Investigation without his necessary and legally mandated disability accommodations.  As a result, Plaintiff's disabled son was subjected to a biased and blatantly unfair process and procedure in which he was required to defend himself against heinous accusations of sexual misconduct.

71.     Even more appalling, following the Title IX Investigation, Defendant Drake held a hearing to adjudicate the allegations lodged against Plaintiff's disabled son (the "Title IX Hearing").  Plaintiff's disabled son's newly-retained attorney got involved and requested that Plaintiff's disabled son be afforded accommodations. Again, Defendant Drake ignored such requests and unlawfully forced Plaintiff's disabled son to defend himself without the necessary and proper accommodations.

72.     Indeed, even prior to the Title IX Hearing, an order was issued which restricted the introduction of any evidence relating to other sexual activity or mental health conditions of either Plaintiff's disabled son or the female complainant. In essence, the order precluded evidence of both the assault on Plaintiff's disabled son and Plaintiff's disabled son's medical incapacities, two vital issues which Defendants were required, by law, to address.

73.     Moreover, Defendants forced Plaintiff's disabled son to be his own advocate and act as his own legal representative during the entire nine-hour long Title IX Hearing despite knowing full well that Plaintiff's disabled son suffered from a language-based disability.

Defendants even went so far as to bar Plaintiff from attending the Title IX Hearing. Indeed, when Mr. and Mrs. Rossley attempted to attend the Title IX Hearing, Defendants afforded them fewer accommodations while simultaneously offering comfort rooms for the female complainant's family...

74.      As a student with documented learning disabilities, Plaintiff's disabled son was not provided with disability accommodations at any time throughout the investigation and subsequent hearing in order to fully defend himself.  Accordingly, Plaintiff's disabled son was not qualified to serve as his own attorney for the duration of the nine hour long Title IX Hearing.

75.      Plaintiff's disabled son's disability manifested numerous times throughout the Title IX Investigation and Title IX Hearing. Significantly, Plaintiff's disabled son's disabilities made it exceedingly difficult for him to properly and confidently communicate, forcing Plaintiff's disabled son to be more quiet and inarticulate during conversations (or in this case interrogations), and, in the absence of the proper accommodations, made it virtually impossible for Plaintiff's disabled son to adequately participate in the serious dialogue mandated by the Title IX Investigation and Title IX Hearing.

76.      Indeed, upon information and belief, persons with ADHD and anxiety, especially those placed under extreme stress, find it difficult to accurately articulate their thoughts and, in turn, are often stereotypically misjudged as being not forthcoming, evasive, and uncooperative when the reality is far different.

77.      Upon information and belief, rather than accommodate Plaintiff's disabled son during the Title IX Investigation and Title IX Hearing, Defendants used Plaintiff's disabled son's medical conditions against him and drew unfair and inaccurate credibility determinations, all as a

result of his compromised ability to communicate in the absence of being afforded proper accommodations for his disabilities.

78.     Incredibly, during the Title IX Hearing, Plaintiff's disabled son's female accuser **admitted**, on the record, before Defendants' representatives, to sexually assaulting Plaintiff's disabled son without his consent, as such term is used and understood under Defendants' Sexual Assault Policy. Nevertheless, despite such admission by the female accuser, the assault on Plaintiff's disabled son was once again permitted to stand uninvestigated.

79.     At the Title IX Hearing in February 2016, Defendant Drake found Plaintiff's disabled son guilty of the accused misconduct and levied the disproportionately harsh sanction of expulsion against him.[2]

80.     Notably, the Defendant Board's Chair, Larry Zimpleman ("Board Chair Zimpleman"), claimed to Board of Trustee members that he and Defendant Martin, Drake University's President, had been in close contact since October regarding all phases of the process.   Thus, Defendant Martin, the Defendant Board, and by extension, the Board Affairs Committee and the entire Board of Trustees were party to the discriminatory and unlawful practices by not demanding an investigation of the sexual assault perpetrated against Plaintiff's disabled son, and by refusing to provide reasonable accommodations to Plaintiff's disabled son throughout the Title IX Investigation and Title IX Hearing.

***Plaintiff Continues to Advocate for His Disabled Son and***
***The Rights of all Students at Drake University***

---

[2] Plaintiff's disabled son appealed this decision and lost his appeal. Plaintiff and Plaintiff's disabled son aver that the Title IX Investigation, Title IX Hearing, and subsequent appeal were deficient in several aspects. Following the ultimate conclusion of the Title IX Investigation, Title IX Hearing, and subsequent appeal, Plaintiff's disabled son instigated an action against Defendants, and others, in the Iowa Federal District Court for, among other things, violations of Plaintiff's son's rights as guaranteed under Title IX.

81.     Throughout the Title IX Investigation, Title IX Hearing, and thereafter, Plaintiff continued to advocate for the rights of not only his disabled son, but for all of Defendant Drake's students, both complainants and respondents.

82.     Indeed, on several occasions, Plaintiff voiced his concerns and complaints about how Defendants implemented Drake University's Title IX procedures to bias the accused male students, and how Defendants had adamantly refused to accommodate its disabled students.   In response, Plaintiff's concerns were openly disregarded and at several times, challenged.

I.      **The April 7 Email**

83.     In an email dated April 7, 2016, Plaintiff contacted Dean Parker via email, copying Board Chair Zimpleman, and, among other comments, once again raised his concern over how Defendants conducted the Title IX Investigation and Title IX Hearing.  Specifically, Plaintiff stated, in pertinent part:

> "I also find it very interesting that;
>
> 1. [y]ou are not offended that your investigator and your hearing officer ignored the documented disabilities afforded [my son] by the Americans With Disabilities Act.
>
> 2. You were not outraged that your investigator took the liberty of front running the witnesses by determining ahead of time what they would or would not have said;
>
> 3. You were not curious that key elements of [my disabled son's] testimony were omitted from the investigator's report[;]
>
> 4. You consider it 'fair and thorough' that the complainant's assault on [my disabled son] was not pertinent enough to investigate so [my disabled son] could have received a fair hearing; [and]

> 5. You were not flabbergasted that your office was guilty of selective enforcement of the complainant's 'admitted' sexual assault on [my disabled son]…

84.     No one responded to Plaintiff's email, once again ignoring his requests for accommodations for his disabled son and his allegations of discrimination against his disabled son.

## II.     The April 26, 2016 Letter

85.     On April 26, 2016, at approximately 5:46 a.m., Plaintiff sent an emailed letter to the Defendant Board and select members of Defendant Drake's faculty and administration which once again outlined and complained of, among other things, Defendants' blatant and unlawful disregard for his disabled son's disabilities during the Title IX Investigation and Title IX Hearing, and Defendants' biased and non-compliant Title IX procedures (the "April 26 Letter").

86.     The April 26 Letter also expressed concerns for all Drake University students who may find themselves in circumstances similar to Plaintiff's disabled son, and called for a review of all internal procedures at Defendant Drake with respect to reasonable accommodations and Title IX Investigations, among other things.

87.     Specifically, the April 26 Letter described the harrowing and clearly biased experience his disabled son endured during the Title IX Investigation and Title IX Hearing, and raised numerous concerns.

88.     With regard to Plaintiff's disabled son's disabilities, Plaintiff asserted in the April 26 Letter that:

> [My disabled son] has what is referred to in the industry as a "word retrieval issue". He has trouble articulating his thought and coming up with the correct words to express himself. The A.D.A. grants him specific protections and Drake has tried to accommodate him

in the classroom for the last four years.   However, [Defendant Drake's] investigative Title IX team and the Office of Student Life ignored   [my   disabled   son's]   disability   entirely.   No accommodations were afforded him during either the investigative process or the official university disciplinary hearing … Soon after I learned that [my disabled son] had been accused, I brought it up in December in a conversation with the Office of Student Life and it fell on deaf ears.

…

*Do we want to be known as a university that ignores student's disabilities when it comes to enforcing our policies and procedures?*

89.     With regard to the sexual assault perpetrated against Plaintiff's disabled son,

Plaintiff complained that:

Early in the investigative process it became clear to [my disabled son] that the complainant had actually <u>sexually assaulted him</u> during the night in question.   His [sic] raised this issue with Drake's investigator back in October, but his claim was dismissed and ignored. The Title IX staff did not investigate it nor was it included in the investigator's findings.

[My disabled son] had every right to expect that when he made the claim that a sexual assault was perpetrated on him that the Drake investigator would process the claim appropriately.   **From the Dear Colleague letter from 2011, "Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."** <u>When I brought it up to the Student Life Office in December, it was again dismissed</u> – I was told that they would view the claim as "*retaliatory*" and refused to consider it as either a part of the case OR as a stand-alone   violation.   **Also   from   the   Dear   Colleague   Letter, "Regardless of whether a harassed student, his or her parent, or a third party files a complaint under the school's grievance procedures   or   otherwise   requests   action   on   the   student's behalf, a school that knows, or reasonably should know, about possible harassment must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation".** *They knew, and it was not done.*

24

…

> *Is this the kind of selective prosecution we as a Board are willing to own in the public domain? What effect will this have on our admission numbers from male students?*
>
> *If Drake is selectively prosecuting only men for sexual assault, the University could have some substantial liability.*

90.     With respect to Defendants' bias against the male accused and Defendants' repeated violations of Drake University's own policies, Plaintiff complained that, among other things: (i) Investigator Sirna was permitted to investigate the female student's allegations against his disabled son despite having a significant conflict of interest and also having a simultaneous position which clouded her impartiality, in violation of Title IX; (ii) Investigator Sirna selectively chose to not speak with key witnesses whom she knew or should have known would have helped Plaintiff's disabled son's case and defense; (iii) the investigative report unreasonably and baselessly attacked Plaintiff; (iv) Drake University failed to offer Plaintiff's disabled son any support, even after he reported his being sexually assaulted; and (v) Drake University improperly used the preponderance of the evidence standard and made determinations based on mere speculation and circumstantial evidence rather than fairly assessing all the facts at issue.

91.     In the April 26 Letter, Plaintiff alerted Defendants to the potential liability Drake University and the Defendant Board faced, and what continuing to practice under such biased and legally flawed policies could mean for Drake University and its students.

***Defendants Immediately Try to Silence Plaintiff and Retaliate Against Mr. Rossley***

92.     In response to the April 26 Letter, Plaintiff received a series of supportive and understanding emails and phone calls from his fellow trustees. The responses from the Defendant

25

Board's presiding and high-ranking members and Defendant Martin, however, were much different.

93.     The highest-ranking officials on the Defendant Board immediately sprang into action to silence Plaintiff's complaints.  Indeed, on April 26, 2016, at approximately 1:48 p.m., a mere eight (8) hours after receiving Plaintiff's written complaints in the April 26 Letter, Board Chair Zimpleman, sent a mass email to each recipient of the April 26 Letter (the "April Response Email").

94.     In the April Response Email, Board Chair Zimpleman insisted that no member of the Defendant Board engage in any "discussions of the issues" raised in the April 26 Letter and instructed the trustees to keep Plaintiff's complaints a secret by not sharing the April 26 Letter or its contents with any non-recipient.

95.     Thereafter, on or about April 28, 2016, while attending Defendant Drake's Annual Alumni Awards program, Plaintiff was approached by Board Chair Zimpleman, who abruptly asked Plaintiff to speak with them.

96.     Plaintiff followed Board Chair Zimpleman to a more private location where David Miles, Defendant Board's Chair of the Board of Affairs ("BAC Miles"), was also waiting. At such time, Board Chair Zimpleman and BAC Miles cornered Plaintiff and verbally attacked Plaintiff for complaining about the numerous violations of his disabled son's rights.  Board Chair Zimpleman and BAC Miles told Plaintiff that he had to "stop this (meaning his complaints) immediately" and instructed that he needed to stop sending emails and talking to people, on the Defendant Board and off, about what Defendants had done to his disabled son.

97.     Plaintiff was so taken aback, upset, and shocked by Board Chair Zimpleman's and BAC Miles' intimidation tactics that he had to leave the awards ceremony early. After coming to terms with that altercation, approximately five days later, Plaintiff agreed in an email not to publicly speak about the Title IX Investigation or Title IX Hearing again. Specifically, Plaintiff stated that he was "disassociating" himself so that he could remain on the Defendant Board in good standing, as requested by BAC Miles and Board Chair Zimpleman.

98.     Despite Plaintiff's agreement to toe Defendants' line, Defendants continued to retaliate against Plaintiff.

99.     Following the blatant assault on Plaintiff for complaining about Defendants' repeated violations of federal law with regard to his disabled son, Defendants attempted to purge Plaintiff from the Defendant Board.

100.    To that end, Board Chair Zimpleman and BAC Miles contacted Plaintiff via telephone and strongly suggested that he step down as a trustee, a position Plaintiff had held for twenty-three (23) years without incident.

101.    Board Chair Zimpleman and BAC Miles offered Plaintiff the option of taking a "leave of absence" until his son's claims against Drake University were resolved. Notably, such an option was not permitted under the Defendant Board's Amended Bylaws, but Board Chair Zimpleman and BAC Miles claimed they would "get it approved."

102.    Further, Board Chair Zimpleman and BAC Miles offered Plaintiff no guarantees or plan to allow him back onto the Defendant Board had he accepted this option. Plaintiff declined Board Chair Zimpleman's and BAC Miles' suggestion. Indeed, Board Chair Zimpleman and BAC Miles confirmed that Plaintiff could not just freely return as a trustee but

would need the required 2/3 of the trustees sitting on the Defendant Board at the time to approve offering him his seat back on the Defendant Board.

103.    Plaintiff declined Board Chair Zimpleman's and BAC Miles' suggestion.

104.    Thereafter, on May 20, 2016, Board Chair Zimpleman, BAC Miles, and Defendant's then Board Chair-elect David Golder ("Chair-Elect Golder"), sent Plaintiff a letter which again suggested that Plaintiff cease being an active member of the Defendant Board (the "May 20 Letter").

105.    Specifically, the May 20 Letter accused Plaintiff of having a conflict of interest as a result of his disabled son's claims against Drake University, and requested that Plaintiff take an indefinite leave of absence, to allegedly conclude after his disabled son's allegations were resolved.

106.    Plaintiff responded and unequivocally rejected Defendants' offer.  Specifically, Plaintiff rightfully noted Defendants' retaliatory actions following the April 26 Letter, correctly noted (again) that the Defendant Board's Amended Bylaws do not allow for the proposed 'leave of absence,' and rejected the proposed option.

107.    Plaintiff went on to, again, complain about the numerous violations of his disabled son's rights, and noted that although Defendant Drake afforded his disabled son accommodations in the classroom, Defendant Drake adamantly refused to offer those same, necessary accommodations during the Title IX Investigation and Title IX Hearing, which was a violation of both State and Federal Law.

108.    Plaintiff further warned that Defendants should seriously consider the events and facts surrounding the Title IX Investigation and Title IX Hearing. These comments were in no

28

way meant to threaten or intimidate Defendants.  Rather, as part of his fiduciary duties, Plaintiff

was obligated to act in the best interests of Defendants which included ensuring that Defendants

remained in compliance with Federal and State laws.    As Plaintiff repeatedly assured

Defendants, Plaintiff was acting as a concerned trustee and meant only to raise concerns to better

protect Drake University and its students.

*Defendants Break Protocol and State Law to Unjustifiably*
*Remove Plaintiff from his Position as a Trustee*

109.    After it became clear that Plaintiff would not simply and quietly step aside, the

Defendant Board immediately took steps to forcibly remove Plaintiff. Indeed, in June of 2016,

the Defendant Board, with the full support of Drake University, sought to remove Plaintiff for an

alleged conflict of interest.

110.    The Defendant Board's Amended Bylaws dictate how and under what

circumstances a trustee may be removed from the Defendant Board.  Specifically, Article II,

Section 5 of the Defendant Board's Amended Bylaws provides, in relevant part: "Any elected

member of the Board may be removed from office for cause, at any meeting of the Board by a

two-thirds vote of the Trustees then in office."

111.    Notably, the Defendant Board's Amended Bylaws do not define what does and

does not constitute "cause" for which a member may be removed.  Moreover, the Defendant

Board's Amended Bylaws do not call for removal of a trustee based upon any conflict of interest.

112.    Indeed, in the event a trustee has a conflict of interest, Article XIV the Defendant

Board's Amended Bylaws provides:

CONFLICTS OF INTEREST

> A Trustee shall be considered to have a conflict of interest if (a) such Trustee has existing or potential financial or other interests which impair or might reasonably appear to impair such member's independent, unbiased judgment in the discharge of his or her responsibility to the University; or (b) such Trustee is aware that a member of his or her family (which for the purposes of this paragraph shall be a spouse, parents, siblings, children, grandchildren, spouses of brother, sisters, children and grandchildren, and any other relative if the latter reside in the same household as the Trustee), or any organization in which such Trustee (or member of his or her family) is an officer, director, employee, member, partner, owner, trustee, or controlling stockholder, has such existing or potential financial or other interests. All Trustees shall disclose to the Board any possible conflict of interest at the earliest practicable time. No Trustee shall vote on any matter, under consideration at a Board or committee meeting, in which such Trustee has a conflict of interest. The minutes of such meeting shall reflect that a disclosure was made and that the Trustee who is uncertain whether a conflict of interest may exist in any matter may request the Board or committee to resolve the questions by majority vote.

113.    Plaintiff was at all times willing to abstain from any vote which may have related to any alleged conflict of interest, perceived or actual, that he had.

114.    The Defendants' attempts to forcibly remove Plaintiff in June 2016 were futile and ultimately unsuccessful as not enough members of the Defendant Board were in attendance to meet the 2/3 threshold requirement to vote to remove Plaintiff.

115.    Still, Defendants were adamant and scheduled another vote to remove Plaintiff as a Trustee for July 19, 2016.

116.    On or about July 17, 2016, Plaintiff spoke to Chair-Elect Golder via telephone, in preparation for the July vote. At such time, Plaintiff *again* raised his concerns surrounding

Defendants' violation of his disabled son's rights under the ADA.   Specifically, Plaintiff told

Chair-Elect Golder:

> They (meaning Defendants) ignored the ADA which is a violation
> of federal law. And I brought it to the attention of the office of
> student life in December [of 2015] and [they] just dismissed it. []
> And I've been trying for months [to have it] dealt with and no one
> wants to talk about it.

117.    Further, with respect to Defendants' Title IX procedures, Plaintiff again

complained to Chair-Elect Golder that, among other things, Defendants:

a.  Permitted his disabled son to be expelled without having been afforded a proper
investigation or hearing as required under Title IX; and

b.  "Buried an investigation" into the assault on Plaintiff's disabled son which was a
violation of Title IX; and

c.  Were on notice of multiple violations of title IX and had failed to step in or
otherwise correct the many violations of federal law which damaged not only
Plaintiff, but his disabled son as well.

118.    On or about July 19, 2016, the Defendant Board held a vote, via telephone

conference, to remove Plaintiff as a trustee (the "Removal T/C").

119.    Notably, the Removal T/C was not in compliance with Iowa state regulations

which mandate that any procedure for removal include:

> a. Not less than fifteen days' prior written notice of the expulsion, suspension, or
> termination and the reasons therefor;

> b. An opportunity for the member to be heard, orally or in writing, not less than
> five days before the effective date of the expulsion, suspension, or termination by
> a person or persons authorized to decide that the proposed expulsion, termination,
> or suspension not take place;

> c. The procedure requires consideration of all relevant facts and circumstances
> surrounding the expulsion, suspension, or termination by a person or persons
> authorized to make a decision regarding the proposed expulsion, termination, or
> suspension; and

d. Any written notice given by mail pursuant to this section must be given by first class or certified mail sent to the last address of the member shown on the corporation's records. <u>See</u> I.C.A. § 504.622 <u>et. al.</u>

120.    In contrast, Plaintiff (i) was not afforded at least fifteen days' written notice of the Removal T/C; (ii) was not apprised of the alleged findings for cause before the Removal T/C so that he may respond at least five days prior to the Removal T/C; (iii) was notified only via telephone of his removal; and (iv) the removal T/C did not take into consideration all of the facts surrounding Plaintiff's complaints and the Title IX Investigation and Title IX Hearing against his disabled son.

121.    Specifically, during the Removal T/C, BAC Miles accused Plaintiff of having a "clear, broad, and ongoing" conflict of interest which could not be cured by Plaintiff's recusal from voting on certain matters and accused Plaintiff of breaching, or being likely to breach, his fiduciary duties to Defendant Drake in light of his disabled son's allegations.

122.    Specifically, during the Removal T/C, BAC Miles outlined three "findings" which he alleged rose to the level of "cause" to remove Plaintiff. Such findings included:

a. Plaintiff's alleged "broad and ongoing conflict of interest under the plain meaning of Article 14 of the [Defendant Board's Amended] Bylaws;"

b. Plaintiff's alleged inability to "effectively avoid the conflict by limiting his advocacy;" and

c. Plaintiff's alleged breach of his "fiduciary duty of loyalty to [Defendant Drake] and the risk of future such manifestations of the conflict."

123.    The Defendant Board ultimately voted to remove Plaintiff, allegedly "for cause."

***Defendants' Purported Justification for Plaintiff's Removal is Mere Pretext***

124.    Any purported cause Defendants found to justify removing Plaintiff as a trustee is patently false and a mere pretext for blatant discrimination and retaliation.

125.    Indeed, although the Defendant Board purported to find that Plaintiff had an incurable conflict of interest, it is well known that the Defendant Board is not involved in the legal issues facing Defendant Drake.  Indeed, during the Removal T/C, BAC Miles conceded, on several occasions, that the Defendant Board would **not** be involved in the adjudication of Plaintiff's disabled son's allegations or potential lawsuit[3].  Accordingly, by Defendants' own admissions, the alleged conflict of interest and the purely hypothetical scenarios which BAC Miles contended would cause Plaintiff to breach his fiduciary duties would never have arisen.

126.    Moreover, as per the Defendant Board's Amended Bylaws, the proper process for eliminating *any* conflict of interest, perceived or actual, is for the conflicted trustee to abstain from voting, which Plaintiff freely volunteered to do.

127.    Undercutting Defendants' position even further, is that a mere three months prior to the Removal T/C, Plaintiff disclosed any potential conflict of interest as a result of his disabled son's allegations while working on a municipal bond fundraising issue for Defendants. At such time, Plaintiff offered to abstain from any vote based on his disabled son's legal and educational situation with Defendant Drake.  In response, it was determined by Defendants and Defendants' legal counsel, that Plaintiff did not have to abstain from voting "in light of [his son's] proceedings" because the legal liabilities the Defendants potentially faced were not significant enough to render him unable to act as a trustee when his actions helped obtain in excess of $2.5 million dollars in current and future financial costs for Defendants.

128.    Moreover, any accusation that Plaintiff had (or was likely to) breach his fiduciary duties to Defendants is entirely against the facts and circumstances.  Indeed, as Plaintiff proved time and again, he raised concerns not only for his son, but also to alert Defendants of potentially

---

[3] At the time of the Removal T/C, Plaintiff's disabled son had not yet commenced legal action against Defendants.

serious issues in their policies, and to try and find a solution to such issues which would better protect the Defendant Board, Drake University, and its students.

129.     Further, Plaintiff, at all times relevant, acted in the best interests of Drake University as a thought leader in Defendant Drake's handling of Title IX cases. Specifically, as a trustee, it was Plaintiff's duty to ensure Drake University remained in compliance with federal and state law lest Defendants lose their substantial federal funding. Plaintiff's actions in pointing out the numerous violations of Title IX and the ADA were taken to protect Defendants' financial position. Indeed, it was the Defendant Board who breached its fiduciary duties to Drake University and to the Plaintiff, a parent, an alum, and a trustee, when it ignored Plaintiff's valid complaints and chose to retaliate against Plaintiff instead of ensuring compliance with all applicable laws.

## CAUSES OF ACTION

### COUNT I
### Violation of Title IX of the Education Amendments of 1972

130.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

131.     Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681) ("Title IX"), provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

132.     Title IX applies to an entire school or institution if any part of that school receives federal funds even where there is very little direct federal funding of a particular department or academic and/or extracurricular area.

133.    For the year ending June 30, 2014, Drake had received $1,058,675 in federal funding and $8,988,122 in government grants and contracts.  See Drake University Audit Report, FY 2014, available at http://www.drake.edu/media/departmentsoffices/businessandfinance/ busfin/documents/Final%20FY14%20Drake%20Audit%20Report%20(SHORT%20FORM).pdf (accessed 9/12/16).  Accordingly, Title IX applies to Drake University, as well as the Defendant Board as the governing body of Drake University.

134.    Both the Department of Education ("DOE") and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or the regulations thereunder.  34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[4]

135.    The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved."[5]

136.    Pursuant to Title IX, a funding recipient may not retaliate against a person who speaks out against gender discrimination, even if the complaining individual was/is not the direct victim of such gender discrimination.

137.    As set forth in detail above and herein, Defendants intentionally discriminated against Plaintiff's disabled son by purposefully failing to investigate his complaint of sexual

---

[4] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX* (2001) at 19-20, 21 & nn. 98-101.
[5] *Id.* at 22 (emphasis added).

assault, while vehemently investigating the same (or substantially the same) allegations against Plaintiff's disabled son lodged by a female accuser.

138.    As set forth in detail above and herein, Plaintiff repeatedly and vehemently opposed such gender-biased, unequal treatment and selective enforcement of Defendants' policies and Title IX practices. Plaintiff complained that such enforcement was biased and discriminatory towards male students, both as victims and respondents.

139.    As set forth in detail above and herein, Defendants, at all times, were aware of Plaintiff's complaints.

140.    As set forth in detail above and herein, instead of appropriately addressing Plaintiff's complaints, Defendants, within hours, acted in concert to intentionally chill Plaintiff's speech and lawful complaints, and instigated a retaliatory brigade against Plaintiff which culminated in his unlawful and unjustified removal as a Trustee from the Defendant Board.

141.    Accordingly, Defendants retaliated against Plaintiff in violation of Title IX of the Education Amendments of 1972 and are liable to Plaintiff for damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT II
## Breach of Fiduciary Duties

142.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

143.    As set forth in detail above and herein, the Defendant Board, as the governing body of Drake University, had an ongoing fiduciary duty of loyalty and good faith to Drake University's students and the parents of Drake University's students.

144.    The Defendant Board had an ongoing fiduciary duty to ensure that Drake University was in compliance with all internal policies, as well as with federal and state law, including but not limited to Title IX of the Education Amendments of 1972. This duty arises from, among other things, the Defendant Board's Amended Bylaws, Article I, which state that it is the Defendant Board's duty to approve the general, educational, and financial policies of Drake University. The duty also arises from, among other things, the Defendant Board's Amended Bylaws, which create the Defendant Board's Athletic Affairs Committee which is responsible for the "adherence to and compliance with … Title IX…"

145.    As set forth in detail above and herein, Plaintiff complained in his capacity as a trustee and a parent of, at the time, two Drake University students, that Defendants were improperly enforcing its own policies in violation of federal and state law.

146.    In response to Plaintiff's valid complaints and call for action, the Defendant Board chose to retaliate against Plaintiff and breached its fiduciary duties by failing to adequately respond and remedy the numerous legal infractions at Drake University.

147.    Accordingly, the Defendant Board breached its fiduciary duties to Plaintiff and are liable to Plaintiff for damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT III
## Breach of Contract

148.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

149.    Based on the aforementioned facts and circumstances, Defendants created express and implied contracts when Plaintiff was accepted as a member of the Defendant Board.

Plaintiff at all times was expected to adhere to Defendants' internal policies and procedures, and at all times did so adhere to such policies and procedures.

150.   In contrast, Defendants were required to adhere to and implement Drake University's policies and procedures which Defendants repeatedly failed to do, thus causing Plaintiff significant damages.

151.   Based on the foregoing facts and circumstances, Defendants breached their express and/or implied agreement(s) with Plaintiff and are liable to Plaintiff for damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT IV
## Retaliation in violation of the First Amendment of the United States Constitution Pursuant to 42 U.S.C. § 1983

152.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

153.   As set forth in detail herein and above, Defendants conducted a biased and procedurally defective investigation against Plaintiff's disabled son, and purposefully failed to investigate an admission of sexual assault by a woman against Plaintiff's disabled son.

154.   As set forth in detail herein and above, when conducting the biased Title IX Investigation and Title IX Hearing against Plaintiff's disabled son, Drake University applied the investigative and adjudicatory process dictated to it by the United States federal government. As set forth in detail herein and above, Defendants were mandated to apply those same Title IX investigative and adjudicatory processes to the admission of sexual assault perpetrated against Plaintiff's disabled son by his female accuser. As set forth in in detail herein and above,

Defendants purposefully failed to follow such investigative and adjudicatory processes and chose instead to ignore Plaintiff's disabled son's complaint of sexual assault by a female student.

155.    Under clear and controlling case law, a private actor required by the United States to investigate and adjudicate the violations of a federal statute under terms and procedures dictated by the federal government is a state actor when engaging in such Title IX investigation(s) and adjudication(s).

156.    When Drake University investigated and adjudicated the complaint made by the female student against Plaintiff's disabled son, and when it refused to investigate Plaintiff's disabled son's complaint of sexual assault by a female student, Drake University was a state actor and was therefore required to honor the rights and guarantees set forth in the United States Constitution.

157.    In the course of the Title IX Investigation and Title IX Hearing, Defendants flagrantly violated Plaintiff's disabled son's clearly established statutory and constitutional rights to due process, and clearly established statutory and constitutional rights to be free from discrimination through its repeated acts of gender and disability bias. Based on the foregoing, Drake was a state actor when it violated Plaintiff's disabled son's rights to be free from discrimination and right to due process.

158.    As set forth in detail herein and above, Plaintiff, both during the Title IX Investigation and Title IX Hearing, and thereafter, complained about Defendants' unlawful and discriminatory practices, and pleaded directly to Defendants to address their unlawful policies, practices, and behaviors.

159.   As set forth in detail herein and above, instead of appropriately addressing Plaintiff's complaints during the Title IX Investigation and Title IX Hearing, and thereafter, Defendants acted in concert to intentionally chill Plaintiff's speech and stop Plaintiff's lawful complaints, and instigated a retaliatory brigade against Plaintiff which culminated in his unlawful and unjustified removal as a Trustee from the Defendant Board.

160.   Based on the foregoing, Defendants acts as state actors when they violated Plaintiff's rights and guarantees to free speech as set forth in the First Amendment of the United States Constitution during the Title IX Investigation and Title IX Hearing, and thereafter.

161.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Drake University as follows:

(i)     on the first count for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional distress, damage to his reputation, economic injuries, impact on his future career, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(ii)    on the second count for breach of fiduciary duties in violation of Iowa Common Law, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, damage to his reputation, economic injuries, impact on his future career, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(iii)   on the third count for breach of contract in violation of Iowa Common Law, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, damage to his reputation, economic injuries, impact on his

future career, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(iv)     on the third count for retaliation in violation of the First Amendment of the United States Constitution, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, damage to his reputation, economic injuries, impact on his future career, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements

(v)      Any such other and further relief that the Court finds just and equitable.

## Jury Demand

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

**Dated:   February 17, 2017**

                                   **Respectfully submitted,**

                                   **___/s/ David H. Goldman___**
                                   **David H. Goldman, Esq.**
                                   **Phillip F. Van Liew, Esq.**
                                   **BABICH GOLDMAN, P.C.**
                                   **501 S.W. 7th Street, Suite J**
                                   **Des Moines, Iowa 50309**
                                   **Telephone: (515) 244-4300**
                                   **Email:** dgoldman@babichgoldman.com
                                   **Email:** pvanliew@babichgoldman.com

                                   **-and-**

                                   **_____/s/ Andrew T. Miltenberg_____**
                                   **Andrew T. Miltenberg, Esq.(*pro hac vice* pending)**
                                   **Diana R. Warshow, Esq. (*pro hac vice* pending)**
                                   **Gabrielle M. Vinci, Esq. (*pro hac vice* pending)**
                                   **NESENOFF & MILTENBERG, LLP.**
                                   **363 Seventh Avenue, Fifth Floor**
                                   **New York, New York 10001**
                                   **Telephone: (212) 736-4500**
                                   **Email:** AMiltenberg@NMLLPLaw.com
                                   **Email:** DWarshow@NMLLPLaw.com
                                   **Email:** GVinci@NMLLPLaw.com

                                   **ATTORNEYS FOR PLAINTIFF TOM ROSSLEY**

41