# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| TOM ROSSLEY, | No. 4:17-0058-RGE-SBJ |
| Plaintiff, | |
| v. | |
| DRAKE UNIVERSITY, DRAKE UNIVERSITY BOARD OF TRUSTEES, | **DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

## Table of Contents

Introduction ........................................................................................................... 1

Analysis ................................................................................................................. 2

I.    Plaintiff's retaliation claim fails on the merits because there is no evidence that Defendants' alleged conduct was a pretext for retaliation, and fails on other threshold statutory requirements. ........................................................................................... 2

   A.    Because the undisputed facts show the Board took action against Plaintiff due to his serious, pervasive conflict of interest with Drake, he cannot generate a disputed issue of fact showing retaliatory pretext. ........................................................................ 3

      1.    Defendants' legitimate, non-retaliatory reason for conduct toward Plaintiff was due to Plaintiff's significant conflict of interest with Drake, which interfered with his ability to be a trustee—not retaliatory animus. ..................................................... 4

         a.    While his son's disciplinary matter was pending, Plaintiff informed Drake that his son's litigation was likely and angrily responded to a report that a witness in his son's proceeding had been intimidated by him at Peggy's Tavern................ 4

         b.    Plaintiff emailed the Board about his criticism of Drake's handling of his son's discipline and demanded Drake "discuss equitable resolution" for his son.. 5

         c.    Plaintiff advised the Board that his son had retained his current litigation counsel who would address his son's disciplinary matter "in the courts.".............. 6

d.    Plaintiff refused the BAC's suggestion to take a leave of absence from the Board because of his existing or potential interest in his son's litigation, which was adverse to Drake. ................................................................................ 7

e.    At the recommendation of the BAC, the Board voted and determined Plaintiff had a conflict of interest with Drake as defined by the Board's bylaws... 8

f.    At the BAC's recommendation, the Board voted to remove Plaintiff as a trustee due to his conflict of interest with Drake. ...................................... 9

2.    Plaintiff cannot generate a disputed issue of fact to demonstrate retaliatory pretext. ............................................................................................................ 10

B.    Plaintiff's retaliation claim against Drake should be dismissed because the undisputed facts show Drake had no role in the alleged adverse action........................ 13

C.    Plaintiff's Section 504 claim fails because he is not a qualified individual with a disability. ......................................................................................................................... 15

D.    Because the Board is not a "public accommodation" under the ADA or the ICRA, Plaintiff's retaliation claims against the Board under those theories should be dismissed. ...................................................................................................................... 17

1.    Title III does not recognize the Board as a public accommodation. .......... 17

2.    The ICRA does not recognize the Board as a public accommodation...... 19

II.    Because the Board didn't owe Plaintiff any fiduciary duty, and did not breach any alleged fiduciary duty, the Court may enter summary judgment on his breach of fiduciary duty claim. .......................................................................................................... 21

III.    Because the undisputed facts demonstrate Plaintiff cannot satisfy multiple elements of his breach of contract claim, it's appropriate to enter summary judgment on Count III. ........................................................................................................................... 23

A.    Because the undisputed facts show that there was no contract demonstrating the Board had any obligation to Plaintiff, his breach of contract claim fails........................................................................................... 24

B.    Any agreement between Plaintiff and Defendants fails due to lack of consideration. ....................................................................................... 25

C.    Plaintiff cannot prove the terms of any contract or any breach of any terms......................................................................................................... 26

**D.   Plaintiff admits he has no damages based on any alleged breach of contract.** ............................................................................................................. **26**

**Conclusion** ........................................................................................................................... **26**

**Introduction**

Plaintiff Tom Rossley served as trustee for Defendant Drake University Board of
Trustees ("Board"). His son, Thomas Rossley, was enrolled at Defendant Drake University
("Drake"). Another Drake student reported that Plaintiff's son had sexually assaulted her. Drake
applied its disciplinary process to Plaintiff's son, found him responsible for sexual assault, and
expelled him. Plaintiff believed that Drake had mishandled his son's disciplinary matter, had
violated his son's Title IX rights, and violated his son's right to accommodation under the
Americans with Disabilities Act during the disciplinary process. There is no dispute Plaintiff had
a strong emotional reaction to the outcome of his son's disciplinary matter.

The Board did not fault Plaintiff for his personal feelings or beliefs as a parent. The
Board was concerned, however, with how Plaintiff's advocacy of his feelings and beliefs
presented a pervasive, serious conflict of interest between himself and Drake. For example,
Plaintiff repeatedly and consistently advocated for his son by appealing to the Board to intervene
and demanding reversal of the outcome of his son's discipline. Plaintiff publically advocated for
his son's cause at a Drake event, and over social media, criticizing Drake's processes and the
handling of his son's disciplinary matter. Plaintiff reacted angrily when he was advised to refrain
from further contact with a student witness from his son's hearing, who had reportedly been
made to feel uncomfortable by Plaintiff when he appeared at the bar where she was working
following Plaintiff's son's hearing. Plaintiff repeatedly informed the Board of his son's intent to
pursue legal action against Drake. Plaintiff sought information from Drake through his role as a
trustee about Drake's Title IX statistics.

When confronted with these developments, the Board attempted to address Plaintiff's
behavior without resorting to a vote to remove him. Plaintiff refused a suggestion to consider
taking a leave of absence from the Board. He made clear that he had no intention to distance

1

himself from his son's cause, either. Consequently, Plaintiff's position forced the Board to determine Plaintiff had a conflict of interest, and the Board voted to remove him as a trustee.

In Count V, Plaintiff claims that the Board's action amounts to retaliation under various disability discrimination laws. This claim fails on the merits because Plaintiff cannot prove that the Board's legitimate non-retaliatory reason for its conduct—concern with Plaintiff's admitted conflict of interest with Drake—was a pretext for disability retaliation. His retaliation claims also fail because Plaintiff cannot meet various other statutory requirements need to proceed under any theory. Plaintiff's other claims for breach of fiduciary duty (Count II) and breach of contract (count III) fail as well. The Board did not owe Plaintiff any fiduciary duty, did not breach any duty, and had no contract with him. Plaintiff's remaining claims should be dismissed under Rule 56.

## Analysis

Defendants ask the Court to dismiss the all remaining claims in Plaintiff's Amended Complaint: (1) Count V, which alleges various retaliation theories against Defendants under different disability discrimination laws; (2) Count II, which alleges a breach of fiduciary duty claim against the Board; and (3) Count III, which alleges a breach of contract claim against both Defendants.

**I.    Plaintiff's retaliation claim fails on the merits because there is no evidence that Defendants' alleged conduct was a pretext for retaliation, and fails other threshold statutory requirements.**

In Count V, Plaintiff alleges an unusual public accommodation retaliation claim under Title III of the Americans with Disabilities Act ("Title III"), 42 U.S.C. § 12181, *et seq.*, Section 504 of the Rehabilitation Act of 1974 ("Section 504"), 29 U.S.C. § 701, *et seq.*, and the Iowa Civil Rights Act ("ICRA"), Iowa Code §§ 216.7 & 216.11. Plaintiff alleges that he experienced retaliation when he complained about Drake's handling of his son's disciplinary proceeding with

the Board and Drake, and Defendants "acted in concert to dissuade and intimidate Plaintiff from speaking out on behalf of his disabled son and Defendants' disabled students," and removed him as a trustee of the Board. Am. Cmplt. ¶ 174. This claim fails for myriad reasons on the various theories he asserts.

First, this claim fails on the merits because the undisputed facts are devoid of retaliatory pretext. The facts show the Board took action against Plaintiff because he had a serious conflict of interest with Drake University—not because he engaged in any protected conduct. Second, his claim against Drake fails because Plaintiff has generated no evidence that Drake took any action with respect to Plaintiff—all conduct against Plaintiff was taken by the Board. Third, his Section 504 claim fails because Plaintiff is not a qualified individual with a disability. Fourth, his claim against the Board fails under the Iowa Civil Rights Act and Title II of the ADA because, under applicable law, neither the Board nor Board membership is a "public accommodation."

### A. Because the undisputed facts show the Board took action against Plaintiff due to his serious, pervasive conflict of interest with Drake, he cannot generate a disputed issue of fact showing retaliatory pretext.

In cases without direct evidence of retaliatory motivation, such as this one, courts analyze the merits of retaliation claims under Title III under the familiar *McDonnell Douglas* burden-shifting framework. *See See Stebbins v. Legal Aid of Ark.*, 512 F. App'x 662, 663 (8th Cir. 2013) (applying *McDonnell Douglas* to Title III retaliation claim). Claims under Section 504 and the ICRA are subject to the same analysis. *See Durand v. Fairview Health Servs.*, 902 F.3d 836, 841 (8th Cir. 2018) (evaluating Section 504 claim under Title III theory and observing "the case law interpreting the two statutes is generally used interchangeably"); *Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1151 (8th Cir. 2011) (analyzing Iowa disability retaliation claim under ADA framework); Iowa Code §§ 216.7 & 216.11.

To prevail, Plaintiff must first meet his prima facie discrimination case by showing: "(1) that he engaged in statutorily protected activity, (2) that an adverse action was taken against him, and (3) a causal connection between the adverse action and the protected activity." *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1074 (8th Cir. 2006) (citing *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1025 (8th Cir. 1999)). If he can prove the prima facie elements, the burden of production shifts to Defendants to show a legitimate, non-retaliatory reason for their actions. *See Mershon*, 442 F.3d at 1074. Then, Plaintiff must demonstrate Defendants' stated reason is pretext for retaliation. *Id.*

For purposes of this portion of the analysis only, Defendants assume that Plaintiff can meet the prima facie elements of his retaliation claim. But the claim nevertheless fails because Plaintiff cannot generate a disputed issue of fact showing Defendants' stated reason for the alleged adverse action is a pretext for retaliation.

1. **Defendants' legitimate, non-retaliatory reason for conduct toward Plaintiff was due to Plaintiff's significant conflict of interest with Drake, which interfered with his ability to be a trustee—not retaliatory animus.**

The facts in this case are undisputed and reveal the absence of retaliatory pretext. All undisputed facts show the alleged adverse action was motivated by Plaintiff's conflict of interest with Drake.

a. **While his son's disciplinary matter was pending, Plaintiff informed Drake that his son's litigation was likely and angrily responded to a report that a witness in his son's proceeding had been intimidated by him at Peggy's Tavern.**

Plaintiff, a long-time trustee of the Board, admits that, as early as February 2016, he placed Drake on notice that his son was likely to commence litigation against it due to its handling of his son's student disciplinary matter. App. 21[187:16-24]. He later shared this intent in a March 28, 2016 email to Drake's Vice President of Finance. App. 3[35:12-36:7]. Plaintiff disclosed that his son "may be initiating litigation against Drake" in the event his expulsion

4

wasn't overturned on appeal. App. 3[36:12-17]; 75. Plaintiff testified that he felt compelled to disclose this information in connection with a prospectus for a bond issuance, for which he was providing assistance as a trustee, because he felt that Drake's ability to pay the bond might be affected by his son's litigation against Drake. App. 3[36:20]-4[37:15].

Roughly one week later, Plaintiff wrote an angry email to Dean of Students Gerald Parker, and copied Board Chair Larry Zimpleman. App. 109-110. Plaintiff was responding to Drake's request that he refrain from visiting Peggy's Tavern, where a bartender who was a witness in his son's disciplinary proceeding worked. App. 8[94:21]-9[97:12]; 10[104:13-19]. The witness had complained to Parker about the way Plaintiff had interacted with her when he, his son, and others had visited Peggy's Tavern following his son's hearing in February. *Id.* Plaintiff received a request, through his son's attorney, to discontinue his visits to Peggy's because the bartender had reported that Plaintiff had stared at her uncomfortably. *Id.* Plaintiff informed Dean Parker and Zimpleman that he would not refrain from visiting Peggy's, suggesting that instead, Drake could "establish a 'safe place' on campus" for this witness with "a little cozy room with a television playing cartoons, surrounded by stuffed animals and access to warm milk and cookies[.]" App. 109-110. In that same email, Plaintiff was critical of Drake's handling of his son's disciplinary matter, claiming among other things, that Drake was selectively enforcing its Code of Conduct, that Drake had allowed the investigator to "slander" Plaintiff in the investigatory report, and that Drake had ignored his son's disabilities. *Id.*

### b. Plaintiff emailed the Board about his criticism of Drake's handling of his son's discipline and demanded Drake "discuss equitable resolution" for his son.

On April 26, 2016, Plaintiff escalated his concerns by sending a five-and-a-half page single-spaced email directly to members of the Board and select members of Drake's faculty and administration. Am. Cmplt. ¶ 89; App. 11[108:1-24]; 111-116. He was sharply critical of

5

Drake's handling of his son's discipline and insisted that Drake "come to the table and discuss equitable resolution" for his son's discipline. App. 112. Plaintiff asked the Board to examine Drake's handling of Title IX cases, and accused Drake of failing to accommodate his son's disability in the disciplinary process. App. 112-113. Plaintiff then spoke to Bob Soltis, who was President of Drake's Faculty Senate, and told Soltis that Soltis had a responsibility to distribute his April 26 letter to all faculty. App. 14[150:9-152:3]. Chair Zimpleman promptly responded to Plaintiff's April 26 email by replying to all recipients and asked Board members to refrain from discussing this issue among themselves while he, David Miles, and Plaintiff spoke. App. 111. At that time, Miles was chair of the Board of Affairs Committee ("BAC"), which oversees trustees' compliance with Board expectations and duties. App. 63[17:1-5]; 41[12:8-20].

At a Drake alumni event a few days later, Zimpleman and Miles personally met with Plaintiff and asked him to stop speaking to alumni and donors of Drake about his concerns with his son's disciplinary process and Drake's compliance with the law. App. 12[141:4-13]; 13[142:5-23]. Zimpleman advised that if Plaintiff wanted to remain a Board member, he needed to "disassociate [himself] from [his] son's issues." App. 13[145:18-146:15]. Then, in reference to his son's discipline, Plaintiff told Zimpleman that Drake "screwed this up and they need to fix it." *Id.* He admits this conduct qualified as advocacy for his son. *Id.*

### c. Plaintiff advised the Board that his son had retained his current litigation counsel who would address his son's disciplinary matter "in the courts."

On May 4, 2016, Plaintiff emailed the Board and wrote that he was disassociating himself from his son's disciplinary proceeding "so that he could remain on the [Board] in good standing[.]" Am. Cmplt. ¶ 101; App. 13[147:19-148:4]; 117. However, this was merely lip service. In the same email, Plaintiff wrote that his son had retained his current litigation counsel, Andrew Miltenberg, "who will take over as counsel while Thomas takes his case to the next

stage." App. 117. Plaintiff wrote that he had "done my best to address [his son]'s concern with

the University to no avail, and Mr. Miltenberg is better equipped to address this in the courts and,

if necessary, the public arena." *Id.*

> **d. Plaintiff refused the BAC's suggestion to take a leave of absence from the Board because of his existing or potential interest in his son's litigation, which was adverse to Drake.**

On May 20, 2016, Zimpleman and Miles suggested that Plaintiff take a leave of absence

from the Board until his son's claims against Drake were resolved. Am. Cmplt. ¶¶ 104 & 105;

App. 16[158:23-159:13]. The BAC followed up with a letter to Plaintiff and again offered him

the opportunity to take a leave of absence of the Board while his son's litigation against Drake

unfolded. *See* App. 118-119. The BAC explained Plaintiff had a conflict of interest that

necessitated the leave:

> Specifically, you and/or your son have an existing <u>or potential</u> financial or other interest which <u>might reasonably appear</u> to impair your independent, unbiased judgment in the discharge of your responsibilities as a Board member. Moreover, the conflict of interest is not transactional in nature such that recusal from certain Board actions related to a particular transaction will avoid the conflict. Rather, the nature of the conflict is broad and ongoing until your son's legal matter is fully and finally resolved.

> No matter how diligent you and the Board attempt to be, as a trustee you would inevitably be exposed to information or participate in discussions involving the University that may be pertinent to the litigation. It will be impossible to anticipate in advance and avoid all of the situations where that type of information or discussion may arise, and as such, until the matter is resolved, your continued engagement as a trustee would necessarily chill the necessary and free exchange of ideas and information among trustees and with staff for fear of broaching subjects that may be pertinent to the lawsuit. In addition, under the Revised Iowa Nonprofit Corporation Act (the "Act"), codified in Chapter 504, as a trustee you have a legal obligation to disclose, or cause to be disclosed, to the other board or committee members information which may be material to the discharge of their decision-making or oversight functions. Therefore, if you learn information about the litigation that may benefit the University, to the detriment of your son, you would be under a legal obligation to share that information with the Board.

App. 118-119 (emphasis in original); *see also* 70[98:16-23]. Plaintiff rejected the suggestion to take a leave of absence from the Board. Am. Cmplt. ¶ 10.

On or around May 26, 2016, Plaintiff responded with a ten-page letter to the Board that stated: "I will not be resigning from the board." App. 19[170:12-21]; 20[174:3-21]; 120. He also wrote: "Thomas's attorney has yet to draft documents relating to a 'demand letter' or 'lawsuit'" and devoted the next nine pages to describe the various wrongs he believes his son experienced because of Drake. App. 19[170:12-21]; 121. Plaintiff concluded his letter by identifying proposed "resolutions," including overturning his son's expulsion "immediately," "getting Thomas a Drake diploma immediately," "compensation to [Plaintiff's] son for lost income for one year" and Plaintiff's son's admission to Drake's MBA program, to be paid by Drake. App. 128-129.

### e. At the recommendation of the BAC, the Board voted and determined Plaintiff had a conflict of interest with Drake as defined by the Board's bylaws.

In a June 9, 2016 email to Plaintiff, the BAC advised Plaintiff of its intent to notify the full Board that the BAC believed Plaintiff had a significant conflict of interest between Drake and his personal interests, and that the BAC would present this issue to the Board in an executive session on June 17, 2016. Dep. Ex. 16. 55[131:21-132:14]; App. 130-131. Meanwhile, Plaintiff continued to attempt to wield his influence as a trustee. For example in a June 14, 2016 conference call with members of the Student Life Committee, Plaintiff requested that the Dean of Students provide statistical information about student assault on campus. App. 15[155:10-156:3].

On June 17, 2016, the full Board met and in an executive session, determined that Plaintiff had a conflict of interest. 56[134:20-135:6]; 71[102:6-13]; 22[191:14-192:24]. The Board referred the matter back to the BAC to propose a recommendation on how to address

Plaintiff's conflict of interest. 56[135:4-6]; 72[105:1-13]. In the executive session of this meeting, two trustees spoke up and asked whether Drake's policies and procedures had been followed with respect to Plaintiff's son's discipline, and expressed an opinion or concerns about the Plaintiff's comments and Drake's alleged conduct in Plaintiff's April 26 letter. App. 37[78:18-80:16]. President Earl ("Marty") Martin, who is a trustee ex officio on the Board, told the Board that Drake had followed its policies with respect to Plaintiff's son. *Id.*; *see also* App. 50[68:1-19].

> f. **At the BAC's recommendation, the Board voted to remove Plaintiff as a trustee due to his conflict of interest with Drake.**

The BAC privately deliberated and unanimously recommended that Plaintiff be removed from the Board for cause due to his conflict of interest with Drake. App. 54[128:7-10]; 57[139:17-21]; 72[105:10-13]. Miles testified that the BAC made this recommendation for three reasons: (1) Plaintiff continued to demand that the Board "intercede in his son's case,"; (2) Plaintiff had a conflict of interest that BAC believed "could not be isolated into a single vote or series of votes," making even periodic recusal unworkable; and (3) Plaintiff was "failing to fulfill his fiduciary obligation of loyalty to [Drake].' App. 54[128:11]-55[130:5].

On July 19, 2016, the Board held a telephonic vote to determine if Plaintiff should be removed from the Board. Am. Cmplt. ¶ 122; App. 23[203:4-16]. Plaintiff was present. *Id.* He recalled Miles stating that Plaintiff had "a 'clear, broad, and ongoing' conflict of interest which could not be cured by Plaintiff's recusal from voting on certain matters and accused Plaintiff of breaching, or being likely to breach, his fiduciary duties to Defendant Drake" in light of his son's allegations." Am. Cmplt. ¶ 125. Miles moved the Board to vote to remove Plaintiff as a trustee and cited three items that "rose to the level of 'cause' to remove Plaintiff" under the bylaws. Am. Cmplt. ¶ 126. Plaintiff identifies these three items as:

    a.      Plaintiff's alleged "broad and ongoing conflict of interest under the plaintiff meaning of Article 14 of the [Defendant Board's Amended] Bylaws;"

    b.      Plaintiff's alleged inability to "effectively avoid the conflict by limiting his advocacy;" and

    c.      Plaintiff's alleged breach of his "fiduciary duty of loyalty to [Defendant Drake] and the risk of future manifestations of the conflict."

Am. Cmplt. ¶ 126 (formatting and quotation marks in Amended Complaint). The trustees cast their votes, and twenty-eight voted to remove Plaintiff from the Board for cause, which satisfied the two-thirds majority required by the bylaws. App. 79; 58[143:5-12]; 73[109:5-13]. Plaintiff admits that he does not know how any individual Board member voted. App. 27[333:8-335:2].

**2. Plaintiff cannot generate a disputed issue of fact to demonstrate retaliatory pretext.**

The facts outlined above demonstrate that Plaintiff cannot prove that Defendants' legitimate, non-retaliatory reason for its conduct toward Plaintiff is a pretext for retaliation. *See Mershon*, 442 F.3d at 1074. Plaintiff can prove pretext by showing that Defendants' proffered reason is "unworthy of credence because it has no basis in fact" or by persuading the court that retaliatory motive "likely motivated" Defendants, which requires a demonstration that "sufficient evidence of retaliation exists for a jury to believe plaintiff's allegations." *Lors v. Dean*, 746 F.3d 857, 868 (8th Cir. 2014) (alteration omitted) (quoting *Walker v. Ark. Dep't of Cmty. Corr.*, 436 F. App'x 729, 829 (8th Cir. 2011)). Plaintiff cannot meet this burden.

The Board's Bylaws identify Drake as the exclusive subject of the Board's authority. *See* App. 76-94, *passim*. Plaintiff and the other trustees were required to "act in accordance with the duties of care, loyalty and obedience." App. 44[21:19-22:7]. This means that the Board must elevate the interests of Drake over the personal interests of any student, faculty member, or staff member. App. 44[22:12-23:2]. The Bylaws state:

CONFLICTS OF INTEREST

A Trustee shall be considered to have a conflict of interest if (a) such Trustee has existing or potential financial or other interests which impair or might reasonably appear to impair such member's independent, unbiased judgment in the discharge of his or her responsibility to the University; (b) such Trustee is aware that a member of his or her family (which for the purposes of this paragraph shall be a spouse, parents, siblings, children, grandchildren, spouses of brother, sister, children and grandchildren, and any other relative if the latter reside in the same household as the Trustee), or any organization in which such Trustee (or member of his or her family) is an officer, director, employee, member, partner, owner, trustee, or controlling stockholder, has such existing or potential financial or other interests. . . .

Am. Cmplt. ¶ 116; App. 91-92.

Plaintiff admits that he had developed a conflict of interest with Drake due to his son's potential litigation against Drake. App. 17[162:19-23]; 21[188:7-12]. Plaintiff's repeated effort to apply pressure to the outcome of his son's disciplinary proceedings, his clear adverse tone and intent of his advocacy against Drake, and repeated threats of his son's litigation against Drake, all while serving as a Trustee, were sufficient for the Board to conclude that Plaintiff had a conflict of interest. The BAC members, who recommended his removal from the Board for cause, agreed that conflict existed and that it qualified as "cause" for removal under the Bylaws. *See* App. 54[128:7-10]; 55[139:17-21]; 72[105:10-13].

The undisputed facts demonstrate that the Board voted in favor of the BAC's recommendation to remove Plaintiff from the Board for cause. App. 58[143:5-12]; 73[109:5-13]; 79. According to Plaintiff, Miles offered three reasons when he moved for his removal: (1) Plaintiff's "broad and ongoing conflict of interest under the plaintiff meaning of Article 14 of the [Defendant Board's Amended] Bylaws;" (2) his inability to "effectively avoid the conflict by limiting his advocacy;" and (3) his breach of his "fiduciary duty of loyalty to [Defendant Drake]

11

and the risk of future manifestations of the conflict." Am. Cmplt. ¶ 126; *see also* App. 54[128:11]-55[130:5]. Retaliatory motivation was not identified as a basis for the motion.

Additionally, the undisputed facts also show that two other trustees spoke up and questioned President Martin about Drake's conduct toward Plaintiff's son. App. 50[68:1-19]; 37[78:18-80:16]. That is, they engaged in alleged protected conduct similar to Plaintiff by asking about Drake's compliance with the ADA. Unlike Plaintiff, however, they never developed conflicts of interest with Drake, and were therefore not subject to any of the alleged adverse action Plaintiff points to in this case. This underscores Defendants' position that it was Plaintiff's conflict of interest, not his advocacy based on his son's situation, which led to the adverse action in this case.

Plaintiff may argue that the Court should infer pretext based on the timing of the alleged adverse action, since it followed his advocacy for his son. While timing may sometimes serve as evidence of retaliatory *causation* to prove a prima facie case, on its own, it's insufficient to establish retaliatory *pretext* on summary judgment. *See Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 633-34 (8th Cir. 2016) (discussing sufficiency of timing issue in ADA retaliation employment claim). In this case, the timing actually supports Defendants' legitimate, non-retaliatory motivation for removal, since it dovetails with the BAC and Board's growing concern about Plaintiff's significant conflict of interest with Drake. In *Mershon*, the Eighth Circuit viewed the timing of an alleged adverse action as evidence that the university's proffered reason *was not* pretext. *See Mershon*, 442 F.3d at 1075-76. It held

> [T]he timing of Mershon's expulsion from campus casts no doubt on the veracity of the University's explanation. The close proximity between his [protected activity] and the University's swift action instead supports its assertion that it acted quickly out of a legitimate concern for the safety of its faculty and students, and nothing in the record indicates that the University's explanation was a mere pretext for discrimination.

*Id.* (citing *Euerle–Wehle v. United Parcel Serv., Inc.*, 181 F.3d 898, 900 (8th Cir. 1999) (finding

no pretext where there was no evidence that the reasons given were an attempt "to disguise an

illegal discriminatory motive"). A similar result is appropriate here.

This leaves Plaintiff with his personal belief that Defendants' alleged adverse action was

motivated by retaliatory animus. Of course, Plaintiff is entitled to his personal belief, but it is not

sufficient to withstand summary judgment. *See Bunch v. Univ. of Ark. Bd. of Trustees*, 863 F.3d

1062, 1069 (8th Cir. 2017) (holding that a plaintiff's personal beliefs were unsupported

allegations and insufficient to create a genuine issue of material fact to preclude summary

judgment); *de Llano v. Berglund*, 282 F.3d 1031, 1035-36 (8th Cir. 2002) (finding that "no

evidence" beyond "mere statements of belief" of an improper motive was insufficient to defeat

summary judgment). Because Plaintiff cannot generate disputed issues of fact that show

Defendants' legitimate non-retaliatory reason for the adverse action was pretextual, summary

judgment is mandated. *See Mershon*, 442 F.3d at 1075-76 (affirming summary judgment on

ADA Title III retaliation claim due to the absence of evidence of pretext).

### B. Plaintiff's retaliation claim against Drake should be dismissed because the undisputed facts show Drake had no role in the alleged adverse action.

Even if the Court finds that a fact question exists as to whether the Board acted out of an

impermissible motive toward Plaintiff, the undisputed facts make clear that Drake took no action

against Plaintiff—all conduct that forms the basis of Plaintiff's adverse actions arose from the

Board. *See* Am. Cmplt. ¶¶ 97-127 (describing the various actions and statements made leading

up to Plaintiff's removal from the Board, all of which were taken or made by Board members).

In its earlier Order, the Court noted that it would not dismiss the retaliation claims against

Drake University because Plaintiff had made an allegation that Drake University and the Board

13

had "acted in concert" to retaliate against him. *See* Order (docket no. 41), at 15 (quoting Am. Cmplt. ¶ 174). However, it is clear at this juncture that this allegation has no real basis in fact, and summary judgment in Drake's favor on all of Plaintiff's retaliation theories is appropriate.

All relevant recommendations and decisions related to Plaintiff's conduct as a trustee, including his removal, were made by the Board. *See* D. SOMF ¶¶ 41-77. For example, it was Zimpleman, the Board Chair, who advised trustees to refrain from commenting on Plaintiff's April 26 email. *See* D. SOMF ¶ 48. Zimpleman and Miles, another Board member, were the ones who approached Rossley at the Annual Alumni Awards program to discuss his involvement in his son's Title IX proceedings. *Id.* ¶¶49-51. Similarly, Zimpleman and Miles were the ones who suggested that Plaintiff take a leave of absence from the Board. *Id.* ¶¶ 54-59. The BAC had extensive communications with Plaintiff that explained their stance that Rossley had a serious conflict of interest with Drake. *Id.* ¶¶ 61-65. The BAC also presented their opinion on the conflict of interest to the Board. *Id.* ¶¶ 67-69. The Board, not Drake, concluded the conflict existed, and it was the BAC and the Board, not Drake, which voted to remove him as a trustee. *Id.* ¶¶ 70-77. This is undisputed.

What Plaintiff cannot prove, because no facts support it, is that any faculty member or administrative staff member, such a member of the Title IX office, or any other member of Drake's staff—attempted to influence the Board's decision, or made any recommendation to the Board regarding Rossley's standing on it at all. The only Drake employee who had any role with Plaintiff's behavior as a trustee was President Martin, but the facts make clear that he only was involved because he was acting in his role as a trustee ex officio of the Board and one of its voting members, not as an employee of Drake. *See* SOMF ¶ 8. To prevail against Drake, Plaintiff must generate a disputed issue of fact that Drake University, not the Board, took an adverse

14

action against him in retaliation for undertaking statutorily protected activity. *See Mershon*, 442

F.3d at 1074. Because there are no facts from which a reasonable fact-finder could infer that

Drake, rather than the Board, took any adverse action, Plaintiff's retaliation claim against Drake

fails. *Mershon*, 442 F.3d at 1074. Count V should be dismissed as to Drake.

### C. Plaintiff's Section 504 claim fails because he is not a qualified individual with a disability.

Defendants move the Court to dismiss Plaintiff's claim under Section 504 of the

Rehabilitation Act because he is not a "qualified individual with a disability." Section 504 of the

Rehabilitation Act allows relief only to qualified individuals with a disability, as defined by

statute:

> No *otherwise qualified individual with a disability* in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance . . . .

29 U.S.C. § 794 (emphasis added). Section 705(20), in turn, contains the following definition:

> (20) Individual with a disability
>
> (A) In general
>
> Except as otherwise provided in subparagraph (B), the term "individual with a disability" means any individual who—
>
>> (i) has a physical or mental impairment which for such individual constitutes or results in a substantial impediment to employment; and
>>
>> (ii) can benefit in terms of an employment outcome from vocational rehabilitation services provided pursuant to subchapter I, III, or VI.

29 U.S.C. § 705(20) (formatting omitted). As amended in 1974, Pub L. No. 93-516, § 111, 88

Stat. 1617 (Dec. 7, 1974), Individuals with Disabilities include: "any person who (a) has a

physical or mental impairment which substantially limits one or more of such person's major life

activities, (b) has a record of such an impairment, or (c) is regarded as having such an

15

impairment." Any party who fails to plead or prove he is a qualified individual with a disability

cannot prevail on a Section 504 claim. *See, e.g.*, *Thrasher v. Barrick*, 986 F.2d 1246, 1248 (8th

Cir. 1993) (affirming dismissal of a Rehabilitation Act claim because the plaintiff failed to allege

facts sufficient to establish that he suffered from a disability under the definition in the

Rehabilitation Act); *cf.* 42 U.S.C. § 12182(a) (under Title III of the ADA, the prohibition against

discriminatory conduct applies more broadly to "[n]o individual" rather than a "qualified

individual with a disability").

Plaintiff may argue that, because associational disability discrimination claims are

contemplated by Section 504, he should be permitted to proceed. That argument fails because, as

the Court correctly observed, associational claims do not provide protections for individuals who

advocate on behalf of an individual with disabilities. *See* Order (docket no. 41), at 12 (collecting

cases). The basis of Plaintiff's retaliation claim is that Drake, as a place of public

accommodation, retaliated against him "culminating in his unlawful and unjustified removal as a

Trustee from the . . . Board," for "complain[ing] about Defendant's unlawful and discriminatory

practices, and pleaded directly to Defendants to address their unlawful policies, practices, and

behaviors" with relation to his son's Title IX disciplinary proceedings. *See* Am. Cmplt. ¶¶ 168,

173, 174. Clearly, the thrust of Rossley's allegations is that he was denied access to and removed

from the Board because he advocated for his son, whom he alleges was disabled. The Court has

found that this is insufficient to support an associational claim. Order at 12. Similarly, Plaintiff

has not alleged that he has a disability, impairment, record of impairment, or is regarded as

having an impairment. Am. Cmplt. ¶¶ 166-176. Summary judgment on Plaintiff's Section 504

claim is appropriate.

**D. Because the Board is not a "public accommodation" under the ADA or the ICRA, Plaintiff's retaliation claims against the Board under those theories should be dismissed.**

As to Plaintiff's Title III and ICRA claims against the Board in Count V, summary judgment is appropriate because the Board is not a public accommodation under Title III or the ICRA.[1]

**1. Title III does not recognize the Board as a public accommodation.**

The Board is not a public accommodation under Title III. The ADA states that "private entities are considered public accommodations . . . if the operations of such entities affect commerce" and fall within one of the twelve delineated categories of places of public accommodation provided in the statute. *See* 42 U.S.C. § 12181(7)(A)-(L); *see also* 28 C.F.R. § 36.104. While the enumerated categories include "undergradute, or postgraduate private school(s)" and "other place[s] of education," notably absent from Title III's definitional section is any mention of access to membership in a private organization. *See* 42 U.S.C. § 12181(7)(J).

Case law from district courts within the Eighth Circuit demonstrate membership organizations like the Board do not qualify as public accommodations. For example, in *Elitt v. U.S.A. Hockey*, the court found that Title III of the ADA did not apply to two hockey clubs. 922 F. Supp. 2d 217, 218 (E.D. Mo. 1996). *Elitt* distinguished the physical access to a place of accommodation and the clubs themselves, noting the plaintiff had only alleged "denial of participation in the youth hockey league instead of denial of access to a place of accommodation, *i.e.*, the ice rink." *Id.* at 223. *Elitt* observed that Title III's enumerated list of places of public accommodation "focuses on *places* of public access and does not list membership organizations under any of the twelve categories," nor were they "sufficiently similar to any of the listed private entities . . . to justify

---

[1] Due to the statutory framework of Section 504, a plaintiff would not need to prove deprivation of a public accommodation to proceed. For the reasons explained above, Plaintiff's Section 504 claim fails for other reasons.

inclusion as places of public accommodation." *Id.* (emphasis in original); *see also Stoutenborough v. Nat'l Football League, Inc.*, 59 F.3d 580, 583 (6th Cir. 1995) ("[T]he plaintiffs' argument that the prohibitions of Title III are not solely limited to [physical] "places" of public accommodation contravenes the plain language of the statute."); *Olinger v. U.S. Golf Ass'n*, 55 F. Supp. 2d 926, 931 (N.D. Ind. 1999), *aff'd* 205 F.3d 1001 (7th Cir. 2000), *cert. granted & judgment vacated on other grounds*, 532 U.S. 1064 (2001) ("The USGA . . . is a membership organization and as such is not itself a place of public accommodation."). *But see Matthews v. NCAA*, 179 F. Supp. 2d 1209, 1219-23 (E.D. Wash. 2001) (observing application of Title III to the NCAA because "the NCAA's certification of eligibility [of a student athlete] acts as an admission ticket to the playing field" and that the NCAA controlled the competitions and relied on the use of a public accommodation's facilities, and other matters (citations omitted)).

This Court's earlier Order recognized the plausibility of Plaintiff's cause of action under Rule 12, discussing *Clement v. Satterfield*, 927 F. Supp. 2d 297, 302 (W.D. Va. 2013). *See* Order at 14-15. *Clement* involved a membership organization that also carried with it a concomitant right to access a facility—vendor spaces in a farmers' market. *See* 927 F. Supp. 2d 297, 302 (W.D. Va. 2013). In *Clement*, the court easily found that the market itself was a place of public accommodation because of its similarities to the types of establishments included in Section 12181(7)(E), including "a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment." *Id.* at 312 (quoting 42 U.S.C. § 12181(7)(E)).

At this stage of the case, it's now appropriate to consider the absence of evidence showing that the Board carries with it a concomitant access to a physical space. Plaintiff

has not generated evidence that is the case—his grievance focuses on membership on the Board—not access to any space.  Unlike cases such as *Elitt*, *Olinger*, and *Stoutenborough*, in which membership in the organization would have provided only amorphous access to events, participation in competitions, and use of facilities not closely associated with the organization, the market in *Clement* was directly and closely tied to the organization, which exclusively maintained the places of public accommodation at issue and membership in the organization acted as the ticket to access to the physical marketplace. *See id.* at 302. Similarly, in *Matthews*, the NCAA's close ties to and direct oversight of facilities of public accommodations made application of Title III appropriate. 179 F. Supp. 2d at 1219-23. There are no similar facts here.

And, there is no evidence to show that membership on the Board acts as a ticket to Drake's campus or any of its activities. *See* App. 76-94, *passim*. Plaintiff's removal from the Board has not impacted his ability to access and enjoy the physical spaces Drake maintains in any way. There is an insufficient nexus between membership on the Board and access to or enjoyment of a physical place of accommodation for Rossley's complaint that he was denied access to membership on the Board to support a Title III ADA claim. Because the Board does not constitute a "place of public accommodation" under the ADA, summary judgment on this claim as to the Board is appropriate.

### 2. The ICRA does not recognize the Board as a public accommodation.

Plaintiff's claim against the Board in Count V under the ICRA fails for the same reason—the Board is not a public accommodation. The ICRA defines a "public accommodation" as follows:

> "Public accommodation" means each and every place, establishment, or facility of whatever kind, nature, or class that caters or offers services, facilities, or goods for a fee or charge to nonmembers of any organization or association utilizing the

place, establishment, or facility, provided that any place, establishment, or facility that caters or offers services, facilities, or goods to the nonmembers gratuitously shall be deemed a public accommodation if the accommodation receives governmental support or subsidy. Public accommodation shall not mean any bona fide private club or other place, establishment, or facility which is by its nature distinctly private, except when such distinctly private place, establishment, or facility caters or offers services, facilities, or goods to the nonmembers for fee or charge or gratuitously, it shall be deemed a public accommodation during such period.

Iowa Code § 216.2(13)(a).

Under the ICRA, to plead and prove that he was denied access to a public accommodation, Plaintiff must allege that the Board retaliated against him by depriving him of enjoyment of a physical "place, establishment, or facility." He cannot do so because he has not generated any evidence of being barred from Drake's spaces.[2] All it has done, in Plaintiff's own words, is "unlawful[ly] and injustifi[ably] remov[e him] as a Trustee from the . . . Board." Am. Cmplt. ¶ 174. This is insufficient, as he has not and cannot allege more than mere denial of membership in an organization. This clearly fails under Iowa law.

In *U.S. Jaycees v. Iowa Civil Rights Commission*, the Iowa Supreme Court determined whether the U.S. Jaycees organization was a "public accommodation" under the ICRA. The Iowa Supreme Court examined the definition of "public accommodation" in the ICRA, the current version of which is identical in substance to the definition at issue in *Jaycees*. 427 N.W.2d 450, 454 (Iowa 1988). It determined the terms "places," "establishments," and "facilities" should all be given their ordinary meaning and that they should be interpreted "in light of the meaning of words with which they are associated." *Id.* at 453-54. With that understanding, the Iowa Supreme Court ruled that the organization itself did not constitute a "public accommodation" under the statute because the terms used in the ICRA "connote[] a spatial dimension which the Jaycees'

---

[2] Although Plaintiff was asked to refrain from visiting Peggy's Tavern after a witness complained about him, App. 109-110, Peggy's Tavern is not part of Drake University.

membership, as such, does not possess." *Id.*  Under the Iowa law, summary judgment is

appropriate on Plaintiff's ICRA claim against the Board in Count V.

**II.    Because the Board didn't owe Plaintiff any fiduciary duty, and did not breach any
alleged fiduciary duty, the Court may enter summary judgment on his breach of
fiduciary duty claim.**

In Count II, Plaintiff alleges the Board breached an alleged fiduciary duty to him "to

adequately respond and remedy the numerous legal infractions" he believes Drake committed

with respect to his son's discipline. Am. Cmplt. ¶ 150. To prevail on a breach of fiduciary duty

claim, Plaintiff must establish that the Board owed him a fiduciary duty. *See Kurth v. Van Horn*,

380N.W.2d 693, 697-98 (Iowa 1986). The undisputed facts demonstrate there is no such duty.

The Iowa Supreme Court has provided guidance on what qualifies as a "fiduciary

relationship": "A fiduciary relationship exists between two persons when one of them is under

a *duty* to act for or to give advice for the benefit of another *upon matters within the scope* of the

relation." *Kurth*, 380 N.W.2d at 695-96 (emphasis added) (quoting Restatement (Second) of

Torts § 874 comment a, at 300 (1979)). The Iowa Supreme Court explained:

> Some relationships necessarily give rise to a fiduciary relationship. Such
> relationships include those between an attorney and client, guardian and ward,
> principal and agent, executor and heir, and *cestui que trust*.

> Some of the indicia of a fiduciary relationship include the acting of one person for
> another; the having and exercising of influence over one person by another; the
> inequality of the parties; and the dependence of one person on another.

> Because the circumstances giving rise to a fiduciary duty are so diverse, any such
> relationship must be evaluated on the facts and circumstances of each individual
> case.

*Id.* (internal citations omitted).

There is no dispute that that Plaintiff owed a fiduciary duty to Drake, as did the other

trustees. *See* 77-78; Am. Cmplt. ¶ 148; 2[31:17-32:1]. The undisputed facts demonstrate that the

21

converse—a fiduciary duty owed by Defendants to the trustees—did not exist.  First, Plaintiff's

own testimony makes this clear, since he admits that Board *did not* personally owe him a

fiduciary duty. App. 5[66:21-67:6]. The Bylaws make clear that no such duty exists, either.

Article I of the Bylaws describes in detail the Board's duties and powers, stating its "primary

functions shall be policy making and sound resource management of the *corporation* (referred to

in this and the following articles as "University")." App. 77 (emphasis added). The specific

duties and authorities of trustees, all inure to the benefit of Drake—not Plaintiff or any other

trustee, student, faculty member, or parents of students. *See id.* at 77-78. Quite simply, the

Bylaws state that the Board's duties are owed solely to Drake; they do not state that the Board

owes a duty to anyone else. *See* App. 76-94, *passim*.

Plaintiff also alleges that the Bylaws' establishment of the "Board's Athletic Affairs

Committee" demonstrates that the Board owed him a fiduciary duty because it "is responsible for

the 'adherence to and compliance with . . . Title IX[.]" Am. Cmplt. ¶ 148 (first alteration in

original). Defendants agree that one of the expressed duties of the Athletic Affairs Committee

concerns compliance with Title IX; however, the Bylaws make clear that this duty is owed to

Drake's Department of Athletics, a division of Drake. *See* App. 83-84 (stating the Athletic

Affairs Committee "shall review the status, actions, programs, policies, and plans for the future

of the Department of Athletics"). The Bylaws do not express or imply that the Athletic Affairs

Committee is authorized or deputized to provide oversight or review to any person or entity other

than Drake or Drake's Department of Athletics. *See id.*  In other words, the establishment of the

Athletic Affairs Committee does not create any fiduciary relationship between the Board and

Plaintiff, or any Board member, parent, or student.

Other "indicia" of a fiduciary duty owed by the Board to Plaintiff are absent. *See Kurth*, 380 N.W.2d at 695-96. For example, there is no evidence that Plaintiff had a basis to trust in or rely on the Board for any personal purpose. *See Kurth*, 461 N.W.2d at 695 (quoting Black's Law Dictionary 564). The Board had no authority or duty to act on Plaintiff's behalf, to advise Plaintiff on any matter, or to exercise judgment on Plaintiff's behalf. *See id.* The Board wasn't in a position of "having or exercising influence over" Plaintiff the way an attorney, financial advisor, or guardian would. *Id.* There is no evidence that Plaintiff had any "dependence" on the Board, either, because he did not rely on or need anything from the Board, such as income or advice. *See generally* Bylaws; *see also Kurth*, 461 N.W.2d at 696. There is simply no evidence that supports an indicia of a fiduciary relationship that the Board owed to Plaintiff.

And, for the reasons stated above, the Board's actions toward Plaintiff did not breach any fiduciary duty owed to Plaintiff. The Board removed Plaintiff because Plaintiff could not satisfy his fiduciary obligations toward Drake. Summary judgment on Plaintiff's claim in Count II should be dismissed.

## III. Because the undisputed facts demonstrate Plaintiff cannot satisfy multiple elements of his breach of contract claim, it's appropriate to enter summary judgment on Count III.

In Count III, Plaintiff alleges that Defendants breached a contract with him. He claims that Defendants "created express and implied contracts when Plaintiff was accepted as a member of the Defendant Board." Am. Cmplt. ¶ 153. Plaintiff alleges that, as a Board member, he was "expected to adhere to Defendants' internal policies and procedures," and that Defendants failed to "adhere to and implement Drake University's policies and procedures." *Id.* ¶¶ 154 & 155.

To prevail on a breach of contract claim, Plaintiff must show: (1) the parties were capable of contracting; (2) a contract existed between the parties; (3) consideration; (4) the terms of the contract; (5) Plaintiff performed what the contract required him to do; (6) Defendants breached

23

the contract; and (7) Plaintiff suffered damages. *See Magnusson Agency v. Pub. Entity Nat'l*

*Company-Midwest*, 560 N.W.2d 20, 25 (Iowa 1997) (citing Iowa Civil Jury Instruction 2400.1

(1986)); *see also Margeson v. Artis*, 776 N.W.2d 652, 655 (Iowa 2009) ("It is fundamental that a

valid contract must consist of an offer, acceptance, and consideration." (citation omitted)). The

undisputed facts show that Plaintiff cannot prevail because he is unable to satisfy nearly every

element of this claim. His breach of contract claim fails.

**A. Because the undisputed facts show that there was no contract demonstrating the Board had any obligation to Plaintiff, his breach of contract claim fails.**

In Iowa, "[a]ll contracts must contain mutual assent; mode of assent is termed offer and

acceptance." *Heartland Express, Inc. v. Terry*, 631 N.W.2d 260, 268 (Iowa 2001) (quoting

*Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 285 (Iowa 1995)). The Iowa Supreme

Court applies the Restatement (Second) of Contracts ("Restatement") to define an offer:

"manifestation of willingness to enter into a bargain, so made as to justify another person in

understanding that his assent to that bargain is invited and will conclude it.'" *Anderson*, 540

N.W.2d at 285. "We determine whether an offer has been made objectively—not subjectively."

*Heartland Express*, 631 N.W.2d at 268 (citing *Anderson*, 540 N.W.2d at 285). "The test for an

offer is whether it induces a reasonable belief in the recipient that the recipient can, by accepting,

bind the seller." *Id.* (citations and internal alteration omitted).

Plaintiff's volunteer service on the Board fails to establish an offer or assent that the

Board was bound to him. Plaintiff has no recollection of any written contract with the Board that

governed his service. App. 24[237:2-8]. Rather, he appears to believe that by virtue of his service

as a trustee, Drake and the Board owed him certain contractual duties. However, no such

obligation appears in the Bylaws. *See* 76-94, *passim*. The Bylaws provide no mechanism or

support for Plaintiff's belief that service as a trustee can "bind" the Board or Drake to any

24

specific obligation to a trustee. *See id.*; 108-108, *passim.* While there are "expectations" the Board has of its members, such as participation in meetings and fundraising, the expectations are that the Board members will satisfy them—not that the Board will conduct itself in any particular manner toward a trustee. *See* App. 108. The Board also identifies "conditions" of membership, such as the length of tenure and consequences related to attendance. *See id.* Again, the Board applied these conditions to its members; members had no "condition" they could expect the Board to satisfy. *Id.* There is simply no evidence that Plaintiff and the Board assented that the Board owed any duty or obligation to Plaintiff. Absent an enforceable contract, Plaintiff is unable to prove its terms, that he performed according to its terms, or that Defendants breached any contract. Plaintiff's contract claim therefore fails.

**B.  Any agreement between Plaintiff and Defendants fails due to lack of consideration.**

On his breach of contract claim, Plaintiff must also satisfy the element of consideration. *Margeson*, 776 N.W.2d at 655. "Generally, the element of consideration ensures the promise sought to be enforced was bargained for and given in exchange for a reciprocal promise or an act." *Id.* (citing *Magnusson*, 560 N.W.2d at 27). The Iowa Supreme Court has made clear that, "if the promisor did not seek anything in exchange for the promise made or if the promisor sought something the law does not value as consideration, the promise made by the promisor is unenforceable due to the absence of consideration." *Margeson*, 776 N.W.2d at 655-56.

In this case, Plaintiff served as a volunteer member of the Board. It's undisputed that he was not paid for his service and received no benefit other than liability coverage for his service on the Board, as well as "free meals and entertainment" that were made available to him so he could effectuate his service to the Board. *See* App. 24[238:7-19]. Because there is no evidence that Plaintiff ever sought anything from Defendants in exchange for his service on the Board, his breach of contract claim fails for lack of consideration.

**C. Plaintiff cannot prove the terms of any contract or any breach of any terms.**

Plaintiff's breach of contract claim also fails because he cannot prove the terms of any contract, or that a breach occurred. *See Magnusson*, 560 N.W.2d at 25. Plaintiff believes that the Bylaws gave rise to a contractual relationship between him and Defendants. As explained above, the Bylaws establish the Board's obligations and duties to Drake. The Bylaws do not create a contract or duty owed by Defendants to a trustee, and cannot form the "terms" of any contract, much less allow for a "breach" to have occurred. His breach of contract claim fails on this basis.

**D. Plaintiff admits he has no damages based on any alleged breach of contract.**

Finally, Plaintiff's breach of contract claim fails because he cannot prove he experienced any damage from any breach. "The 'ultimate purpose' behind the allowance of damages is to place the injured party in the position he or she would have occupied if the contract had been performed. *Macal v. Stinson*, 468 N.W.2d 34, 36 (Iowa 1991) (quoting *McBride v. Hammers*, 418 N.W.2d 60, 64 (Iowa 1988)).

As explained above, Plaintiff admits that he was not paid for his service on the Board. *See* 24[238:7-19]. The free meals, entertainment, and directors and officers liability coverage were provided to him so he could discharge his service to the Board. *See id.* Consequently, had Plaintiff remained on the Board, he would have been in no different position financially than he is now. His breach of contract claim fails because he cannot establish any damages. *See Margeson*, 560 N.W.2d at 25.

## Conclusion

For the foregoing reasons, Defendants respectfully request the Court grant their motion, enter summary judgment on Plaintiff's remaining claims, and dismiss Plaintiff's Amended Complaint.

Respectfully submitted,

/s/  Frank B. Harty
Frank B. Harty
Mary E. Funk
Nyemaster Goode, P.C.
700 Walnut Street, Suite 1600
Des Moines, Iowa 50309
Telephone: 515-283-3100
Facsimile: 515-283-8045
Email: fharty@nyemaster.com
MEF@nyemaster.com


and

/s/  Frances M. Haas
Frances M. Haas
Nyemaster Goode, P.C.
625 First Street SE, Suite 400
Cedar Rapids, Iowa  52401
Telephone:  319-286-7000
Facsimile: 319-286-7050
Email:  fmhaas@nyemaster.com

ATTORNEYS FOR DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 19, 2018, I electronically filed the foregoing document with the Clerk of Court using the ECF system which will send notification of such filing to the following:

David H. Goldman, Esq.
Phillip F. Van Liew, Esq.
BABICH GOLDMAN, P.C.
501 S.W. 7th Street, Suite J
Des Moines, Iowa  50309
Telephone:  (515) 244-4300
Email: dgoldman@babichgoldman.com

**-and-**

Andrew T. Miltenberg, Esq. (*pro hac vice*)
Diana R. Warshow, Esq. (*pro hac vice*)
Gabrielle M. Vinci, Esq. (*pro hac vice*)
NESNOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
Telephone: (212) 736-4500
Email: AMiltenberg@nmllplaw.com
Email: dwarshow@nmllplaw.com
Email: GVinci@nmllplaw.com

ATTORNEYS FOR PLAINTIFF THOMAS ROSSLEY

/s/ Frances M. Haas